

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-1998

# Maldonado v. Houstoun

Precedential or Non-Precedential:

Docket 97-1893

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Maldonado v. Houstoun" (1998). *1998 Decisions*. Paper 219.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/219

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1893

EDWIN MALDONADO; MARIA DELORES MALDONADO,
individually and as next friends of Ana Maldonado, Pablo
Maldonado, Edwin Maldonado, Rey Maldonado, Yesenia
Maldonado, and Jose Maldonado, and on behalf of all
others similarly situated; MARIA ORTIZ; MICHAEL ORTIZ,
individually and as next friends of Julie Ortiz, Michael
Ortiz, and Angelica Ortiz, and on behalf of all other
similarly situated; KENSINGTON WELFARE RIGHTS
UNION; PHILADELPHIA WELFARE RIGHTS
ORGANIZATION, on behalf of themselves and their
members; TRAVELER'S AID SOCIETY OF PHILADELPHIA,
individually and on behalf of its clients

v.

FEATHER O. HOUSTOUN, Secretary of the
PENNSYLVANIA DEPARTMENT OF PUBLIC WELFARE;
DON JOSE STOVALL, Executive Director of the
PHILADELPHIA BOARD OF ASSISTANCE, both in their
official capacities,
        Appellants

Appeal from the United States District Court
For the Eastern District of Pennsylvania
D.C. No.: 97-cv-04155

Argued: July 21, 1998

Before: STAPLETON, ROSENN, Circuit Judges,
and
RESTANI, Judge, United States Court of
International Trade*

_____

*The Honorable Jane A. Restani, Judge, United States Court of
International Trade, sitting by designation.

(Filed September 9, 1998)

        John G. Knorr, III (Argued)
        Office of Attorney General of
         Pennsylvania
        Department of Justice
        Strawberry Square
        15th Floor
        Harrisburg, PA 17120
        Counsel for Appellant

        Susan Frietsche (Argued)
        Women's Law Project
        125 South 9th Street
        Suite 401
        Philadelphia, PA 19107
        Counsel for Appellee

OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal presents a significant constitutional question implicating an aspect of Pennsylvania's recent amendment to its public assistance benefits legislation. Pennsylvania made the change during a recent wave of federal and state welfare reform legislation which swept the nation calling for a reduction in overall welfare expenditures. Specifically, we must decide the constitutionality of S 9(5)(ii) of Pennsylvania's Act 35 of 1996. See Pa. Stat. Ann., tit. 62, S 432(5)(ii). It mandates that an eligible family arriving in Pennsylvania from another state shall, during its first twelve months of bona fide residence, receive as cash benefits the lesser of: (1) the benefit level available to similarly situated Pennsylvania residents of twelve months or more, or (2) the benefit level the family would have been eligible to receive in their prior state had they not moved to Pennsylvania.

In 1997, several months after the passage of this legislation, Maria and Edwin Maldonado and their six minor children migrated to Pennsylvania from Puerto Rico. They became eligible for public assistance benefits but were

2

informed that the cash benefits allowance available to them would be substantially lower than the benefits provided to similarly situated long-term Pennsylvania residents.[1]

Shortly thereafter, the Maldonados and several organizations that represent their interests (collectively, the "Maldonados"), instituted a class action against Feather O. Houstoun, Pennsylvania's Secretary of Public Welfare, and Don Jose Stovall, Executive Director of the Philadelphia Board of Assistance, both in their official capacities (collectively, the "Commonwealth"), in the United States District Court for the Eastern District of Pennsylvania. The Maldonados sued pursuant to 42 U.S.C. S 1983, seeking declaratory and injunctive relief, claiming that Pennsylvania's two-tier welfare scheme violates their constitutional rights to travel, to equal protection, and to non-discriminatory treatment under the Privileges and Immunities Clause. The district court held that the scheme did not appear to be supported by a rational basis, and thus likely violated the Fourteenth Amendment's Equal Protection Clause. Therefore, the court preliminarily enjoined enforcement of the two-tier scheme and certified the class, with the Maldonados as class representatives. The Commonwealth timely appealed the injunction. We affirm, although our analysis differs.

I.

The relevant facts of this case are for the most part undisputed. In May 1996, after several attempts to pass similar measures failed throughout the early 1990s, Pennsylvania, as part of the state's broad-scale welfare reform, enacted Section 9(5)(ii), governing public assistance benefits to eligible families that have resided in Pennsylvania for less than one year. Section 9(5)(ii) provides that during the first twelve months of residence in Pennsylvania, an eligible family's cash assistance benefits are limited to the lesser of (1) the benefit level that family

---

1. Pennsylvanians with a twelve month residence were eligible for cash benefits of $836 but the Maldonado family, because of their less than a twelve month residence, was eligible for cash benfits of only $304 per month, the amount they would have been allowed in Puerto Rico.

3

would have received in its prior state of residence, or (2) the benefit level available to otherwise similarly situated long-term Pennsylvania residents.[2] Because Pennsylvania grants larger cash benefits than 40 other states, under this two-tier scheme, a typical eligible family moving to Pennsylvania would lose anywhere from over 60%, to as little as 2%, of their cash benefits for the first twelve months that they reside in the state.

Pennsylvania's legislation received considerable reassurance when several months later, in August 1996, Congress passed landmark welfare reform legislation known as the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), 42 U.S.C. SS 601, et seq. The PRWORA dramatically changed the climate for welfare programs in this country and encouraged states to adopt restrictive cash benefit programs of the type contained in Pennsylvania's Act 35 for those relocating from another state. Among other things, the PRWORA changed the basic funding format for state Temporary Assistance to Needy Families ("TANF ")[3] plans to awards of block grants, expressly terminating the prior program's entitlement nature. Especially relevant to this appeal is Section 604(c) of the PRWORA, which explicitly authorized two-tier cash benefits provisions like that enacted by Pennsylvania. Section 604(c) authorized states to treat new residents differently than longer-term residents.

Prior to May 1997, Plaintiff Edwin Maldonado worked as a mechanic in Puerto Rico and supported his family with his salary plus government-provided nutritional and medical assistance. In May 1997, Maldonado's job ended.

_____

2. Section 9(5)(ii), in its entirety, reads as follows:

    Cash assistance for applicants and recipients of aid to families with
    dependent children who have resided in this Commonwealth for less than twelve months shall not exceed the lesser of the maximum assistance payment that would have been received from the applicant's or recipient's state of prior residence or the maximum assistance payment available to the applicant or recipient in this Commonwealth.

3. TANF replaced the former federal welfare program popularly known as Aid to Families with Dependent Children ("AFDC").

4

He and his wife both had health problems, and therefore in May 1997, they and their six children moved from Puerto Rico to Philadelphia, Pennsylvania, where Mr. Maldonado was born and spent part of his childhood, to seek better health care.

Shortly after establishing residence in Pennsylvania, the Maldonados applied for TANF benefits. The Pennsylvania Department of Public Welfare ("DPW") approved their application and also certified that both Mr. and Mrs. Maldonado temporarily were unable to work. Under Pennsylvania's revised welfare scheme, the Maldonados qualified for monthly cash benefits of $304, the amount they would have received in their prior place of residence, Puerto Rico, $720 in food stamps and medical benefits paid by the state of $1,483.60, plus a one-time grant of $213 to defray job-search expenses.4 Had the Maldonados been residents of Pennsylvania for at least twelve months, they would have been eligible for cash benefits of $836 per month instead of the $304 in benefits that they actually received, a reduction of almost 64%.

As a result of the DPW's benefits decision, the Maldonados sued the Commonwealth on June 19, 1997, seeking a temporary restraining order (TRO) and declaratory and injunctive relief. They claimed that Pennsylvania's two-tier durational residency structure violated their fundamental right to travel, their rights under the Equal Protection Clause of the Fourteenth Amendment, and their rights under the Privileges and Immunities Clause of Article IV and the Fourteenth Amendment.

After denying the plaintiffs' motion for a TRO, the court held a two-day hearing on the application for a preliminary injunction. On October 6, 1997, after considering the memoranda, transcripts, exhibits, and other evidence contained in the sizeable and well-developed record, the district court certified the class and preliminarily enjoined enforcement of Pennsylvania's two-tier durational residency requirement. The court, applying rational basis Equal Protection analysis, held the law irrational. It found that

---

4. The Maldonados returned the $213 grant as both were certified temporarily unable to work.

the class members were likely to succeed on the merits of their constitutional claim that the class would suffer irreparable harm absent the injunction, rejected the Commonwealth's fiscal harm arguments, and found that the public interest would be best served by granting the injunction.[5]

The Commonwealth timely appealed. The district court placed the action in civil suspense pending resolution of this appeal.[6]

II.

On appeal, when considering the district court's grant of a preliminary injunction, we review the court's legal conclusions de novo, its findings of fact for clear error, and its ultimate decision to grant or deny the preliminary injunction for an abuse of discretion. See, e.g., Anderson v. Davila, 125 F.3d 148, 159 (3d Cir. 1997); New Jersey Hosp. Ass'n v. Waldman, 73 F.3d 509, 512 (3d Cir. 1995). Because this appeal presents solely legal questions pertaining to the constitutionality of Section 9(5)(ii) of Pennsylvania's welfare act, our review is plenary. Ordinarily, limited review is appropriate at the preliminary injunction stage of a constitutional challenge to a state statute, but since the issue is legal and the facts are well established, we "need not abstain from addressing the constitutional issue." Thornburgh v. American College of Obst. and Gyn., 476 U.S. 747, 756 (1986).

A.

The Commonwealth succinctly frames the appellate issue in these words: "Whether Pennsylvania violates the

_____

5. On October 30, 1997, the court granted in part and denied in part the Maldonados' motion to amend their complaint to include two additional families as plaintiffs and class representatives, allowing one family--the Ortizes--to join and denying the other.

6. The district court had jurisdiction over this civil rights action pursuant to 28 U.S.C. SS 1331 and 1343. This Court has jurisdiction over the district court's grant of a preliminary injunction pursuant to 28 U.S.C. S 1292(a)(1).

Constitution by providing that, for one year after their arrival in Pennsylvania, applicants for certain welfare benefits may receive only the amount they would have received in their state of prior residence." Thus, we are called upon only to determine the constitutionality of the state statute; the federal statute, PRWORA, is not before us. From a procedural perspective, the district court decided the case on the Maldonados' motion for a preliminary injunction. A district court should grant a preliminary injunction only if (1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest. See Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co., Inc., 963 F.2d 628, 632–33 (3d Cir. 1992). After weighing these factors, and although the district court found that all four weighed in the Maldonados' favor, it relied almost exclusively on the first, the likelihood of success on the merits. Thus, if the court incorrectly determined that the Maldonados were likely to succeed on the legal merits of their claim, it erred in granting the injunction. Because the Commonwealth limits its appeal to the merits issue, we need only address the propriety of the district court's legal conclusions.

B.

Under the Equal Protection clause, no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, S1. Pennsylvania's two–tier act warrants equal protection analysis because it classifies bona fide residents of the state into two groups when determining welfare benefits. In determining the extent of cash welfare benefits, Pennsylvania created two classes of indigent residents indistinguishable from each other except that one is composed of residents who have resided in the state a year or more, and the other of residents who have resided in the state less than a year.

Even though a state has created a classification, not all classifications are per se unconstitutional or automatically subject to heightened judicial scrutiny. If Pennsylvania's durational residency classification " `neither burdens a

7

fundamental right nor targets a suspect class, we will uphold [it] so long as it bears a rational relation to some legitimate end.' " See Vacco v. Quill, 117 S. Ct. 2293, 2297 (1997) (quoting Romer v. Evans, 517 U.S. 620, 631 (1996)); see also San Antonio Indep. School Dist. v. Rodriguez, 411 U.S. 1, 17 (1973). However, if the two-tier scheme is drawn on suspect lines or does sufficiently burden a fundamental right, it is subject to strict scrutiny and will pass constitutional muster only if it is narrowly tailored to serve a compelling state interest. See, e.g., Dunn v. Blumstein, 405 U.S. 330, 335 (1972); Shapiro v. Thompson, 394 U.S. 618, 634 (1969).

The Commonwealth argues that the district court correctly held that Pennsylvania's two-tier durational residence requirement does not penalize the plaintiffs' fundamental right to travel or their right to equal protection, and thus is not subject to strict scrutiny. Instead, it argues that the court erred in holding that the scheme was unconstitutional under rational basis review when it found that it was not related to a legitimate governmental interest. The Commonwealth contends that the statute is rationally related to furthering the Commonwealth's legitimate interest in fostering the self-sufficiency and work ethic of its citizens, including its newest citizens. By leaving recent interstate migrants with the same benefit level as they were in their former place of residence, the statute encourages them to seek work, rather than increased benefits. The Maldonados, not surprisingly, argue that although the court was correct in holding that the statute did not pass rational basis review, that the two-tier scheme penalizes the plaintiffs' fundamental right to travel, and thus should be subject to strict scrutiny. Neither party claims that the scheme classifies on suspect lines.

C.

The constitutional right to travel is not contained in the text of the Constitution, and a majority of the Supreme Court of the United States has never agreed upon its textual source. Analytically, the Court has recognized that the historical foundation upon which this Republic was

8

structured was that we are all citizens of the United States, one people, and, as such, we "must have the right to pass and repass through every part of [the country] without interruption, as freely as in our own States." See The Passenger Cases, 48 U.S. (7 How.) 283 (1849). This right to pass freely from one state to another was one of the attractive features that persuaded the colonists to unite into a nation. The Supreme Court repeatedly and consistently has recognized a fundamental right to interstate travel, see e.g., United States v. Guest, 383 U.S. 745 (1966); Crandall v. Nevada, 73 U.S. (6 Wall.) 35 (1867); The Passenger Cases, 48 U.S. 283, and that inextricably implicated therein is the right to migrate to and settle in another state. See, e.g., Jones v. Helms, 452 U.S. 412, 417–19 (1981); Memorial Hosp. v. Maricopa County, 415 U.S. 250 (1974); Dunn v. Blumstein, 405 U.S. 330, 338; Shapiro, 394 U.S. 618.

Regrettably, however, the law with respect to the constitutional implications of the right to travel is unsettled and in need of clarification. The Court has at times subjected durational residence laws that impinge on the right to travel to strict scrutiny, see Maricopa County, 415 U.S. 250; Dunn v. Blumstein, 405 U.S. 330; Shapiro, 394 U.S. 618, and at other times to what appears to be some form of a heightened rational basis test.7  Furthermore, although never formally recognized by the Court, we have previously noted that Shapiro and its progeny arguably were analyzed, at least in part, as if the classifications at issue were somewhat suspect, in that they "penalized a

_____

7. See Attorney General of New York v. Soto-Lopez, 476 U.S. 898 (1986); Hooper v. Bernalillo County Assessor, 472 U.S. 612 (1985); Zobel v. Williams, 457 U.S. 55 (1982); see also Coburn v. Agustin, 627 F. Supp. 983, 988–94 (D. Kan. 1985) (discussing the Supreme Court's use of "heightened rational basis scrutiny"); Alvarez v. Chavez, 886 P.2d 461, 466–67 (N.M. Ct. App. 1994) (same); Laurence H. Tribe, American Constitutional Law, S 16–3 (2d ed. 1988) (discussing the "new, more penetrating character" of the rational basis test, which he lables "covertly
heightened scrutiny"); Gayle Lynn Pettinga, Note, Rational Basis with Bite: Intermediate Scrutiny by Any Other Name, 62 Ind. L.J. 779, 787–92 (1987) (discussing "rational basis with bite in the right-to-travel context").

group of people on the basis of their having exercised a constitutionally protected right to travel." See Lutz v. City of York, Pennsylvania, 899 F.2d 255, 265 (3d Cir. 1990); see also Thomas R. McCoy, Recent Equal Protection Decisions-- Fundamental Right to Travel or "Newcomers" as a Suspect Class?, 28 Vand. L. Rev. 987 (1975); Todd Zubler, The Right to Migrate and Welfare Reform: Time for Shapiro v. Thompson to Take a Hike, 31 Val. U. L. Rev. 893, 904-05 (1997).

In the seminal right to travel case of Shapiro, 394 U.S. 618, the Court subjected to strict scrutiny several state laws that created one-year durational residence requirements as a prerequisite to eligibility for any welfare benefits. In construing a strikingly similar Pennsylvania statute, the Court in Shapiro expressly held that "any classification which serves to penalize the exercise of th[e] right [to travel], unless shown to be necessary to promote a compelling governmental interest, is unconstitutional." Id. at 634. The Shapiro Court reasoned that the one-year residence requirement imposed on recent migrants as a condition of welfare eligibility, which resulted in a complete denial of benefits for those persons residing in the state for less than one year, was unconstitutional, because it discriminated based solely on length of residency in the state and thus unconstitutionally burdened the plaintiffs' fundamental right to interstate travel and migration.

Five years later, in Maricopa County, the Court, applying Shapiro, similarly subjected to strict scrutiny an Arizona law that required one-year residency in a county as a prerequisite to receiving free nonemergency hospital or medical care. 415 U.S. 250. The Maricopa County Court acknowledged that "any durational residence requirement impinges to some extent on the right to travel" and thus not all durational residency requirements are per se unconstitutional. Maricopa County, 415 U.S. at 256. The Court further stressed, however, that "the right of interstate travel must be seen as insuring new residents the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents." Id. at 261. Thus, because it found that "medical care is as much `a basic necessity of life' to an indigent as

10

[the] welfare assistance" at issue in Shapiro, and that the classification penalized those persons who had"exercised their constitutional right of interstate migration,[the statute] must be justified by a compelling state interest." Id. at 258–59 (citation omitted). The Court then struck down the law, finding that the Arizona statute created"an `invidious classification' that impinges on the right of interstate travel by denying newcomers `basic necessities of life,' " and was not supported by compelling justifications or narrowly drawn. 415 U.S. at 269.

Since Shapiro and Maricopa County, a majority of the Court has never subjected a durational residency requirement to strict scrutiny. Instead, the Court sometimes employs some form of rational basis review, and, occasionally, analyzes such laws without even implicating the fundamental right to travel. See, e.g., Attorney General of New York v. Soto–Lopez, 476 U.S. 898 (1986) (four of the justices applied strict scrutiny in an opinion which did not command a majority); Hooper v. Bernalillo County Assessor, 472 U.S. 612 (1985); Zobel v. Williams, 457 U.S. 55 (1982). This tendency, however, does not establish that rational basis is now the appropriate test when evaluating durational residency requirements as applied to welfare benefits. The Court in those cases merely employed its version of rational basis analysis because the challenged laws could not even survive rational basis review. Thus, the Court found it unnecessary to subject the laws to heightened scrutiny. See, e.g., Soto–Lopez, 476 U.S. at 904 (explaining that because the "contested classifications [in Zobel and Hooper] did not survive even rational basis, [the Court] had no occasion to inquire whether enhanced scrutiny was appropriate"). The holdings of Shapiro and Maricopa County subjecting durational residency requirements that impinge on the right to travel to strict scrutiny, however, have never been overturned and thus are binding precedent to which we adhere in deciding this factually and legally similar case.

In deciding whether a durational residency requirement sufficiently impinges upon the right to travel or migrate to trigger strict scrutiny, the Court looks to see whether the challenged law's "primary objective" is to impede interstate

11

travel; whether it "penalize[s] the exercise of that right;" or whether it "actually deters such travel." Soto-Lopez, 476 U.S. at 903 (plurality opinion) (internal quotations and citations omitted); see also Shapiro, 394 U.S. at 628-34. Here, relying on the legislature's express intent "to promote the self-sufficiency of all the people of the Commonwealth," Pa. Stat. Ann., tit. 62, S 401(a), the district court, in a very thoroughly drafted opinion, agreed with the Commonwealth that the statute's primary objective was not to deter interstate travel and migration. The court also found that the plaintiffs offered no conclusive evidence that the durational residency requirement actually deters the right. Even accepting the district court's conclusions of law that travel deterrence was not the statute's primary objective and the court's finding that the plaintiffs' failure to establish that the duration requirement actually deterred, we are still left with the formidable task of determining whether having exercised the Constitutional right to travel, the plaintiffs were penalized because of the duration of their residence.

The district court ultimately employed rational basis review because it found that the Maldonados could not "demonstrate that Section 9(5)(ii)'s durational residence requirement results in a `penalty' on the right to interstate migration." The court distinguished this case from Shapiro on the ground that scheme at issue in Shapiro resulted in a total deprivation of welfare benefits needed to obtain "life's basic necessities," whereas here the Pennsylvania statute amounted only to a reduction in cash benefits. The law did not deny the Maldonados other welfare benefits. The court compared the Maldonados' position before and after exercising the right, and found it significant that the Maldonados continued to be eligible for TANF benefits at the same level they would have received in Puerto Rico (plus food stamps, medical benefits, and other assistance). Accordingly, the court concluded that

> the lower benefits do not make new residents any worse off because [they] receive exactly what they were receiving or would have received in their state of prior residence. Thus, the `penalty' that plaintiffs allege is imposed on them for exercising their right to migrate

12

interstate is not a `penalty' in the traditional sense of
the word--a lost benefit that the person would have
received had he not exercised some constitutional
right. Indeed, the plaintiffs here have lost no benefit
that they would have received had they not exercised
their right to migrate. . . . Thus, . . . [this court] finds
that Section 9(5)(ii)'s multi-tier durational residency
does not act as a penalty on plaintiffs' right to
interstate migration.

Maldonado v. Houstoun, 177 F.R.D. 311, 331-32 (E.D. Pa.
1997).

Although the Supreme Court has never made clear the
"amount of impact required to give rise to the compelling-
state-interest test," Maricopa County, 415 U.S. at 256-57,
we are persuaded that the district court's "penalty" analysis
in this case misconstrued the import of the relevant case
law and used an improper comparison. Thus it erroneously
concluded that Pennsylvania's two-tier welfare scheme does
not amount to a penalty. First, similar to the Pennsylvania
scheme under review here, two of the three state laws that
the Court struck down in Shapiro offered "partial assistance
. . . to some new residents and full assistance . . . to other
new residents." See Shapiro, 394 U.S. at 695; see also
Zobel, 457 U.S. at 60-66 (holding unconstitutional state
distribution of benefits to citizens on a sliding scale based
on how long they have lived in the state); Erwin
Chemerinsky, Constitutional Law: Principles and Policies,
S10.7, at 703-04 (1997) ("The Supreme Court . . . has ruled
that laws that do not totally deny benefits, but provide less
to new arrivals are unconstitutional."). Thus, that
Pennsylvania's scheme does not amount to a complete
denial of cash benefits and that it provides recent
immigrants with some amount of welfare benefits other
than cash assistance is not dispositive.

Second, and more importantly, as demonstrated by
Shapiro, Maricopa County, and every equal protection case,
the appropriate comparison is between those persons
subject to the classification and those persons who are
similarly situated but for the classification. Here, whether
Pennsylvania's two-tier scheme amounts to a penalty must
be determined by comparing new residents of Pennsylvania

13

and other similarly situated longer-term Pennsylvania residents, and not by comparing new residents of Pennsylvania and those of their former state. Once the Maldonados established bona fide residency in Pennsylvania, a comparison of residents of Puerto Rico with long-term Pennsylvania residents for equal protection purposes is neither sound nor logical; it is not a comparison between analogues. Residents of Puerto Rico have no claim to Pennsylvania welfare benefits or to equal protection under Pennsylvania's welfare laws until they move from Puerto Rico and establish a bona fide residence in Pennsylvania. Only once those persons reside in Pennsylvania is the classification applicable to them.

Although the level of scrutiny to which durational residence requirements are subject may not be applied similarly in all contexts, that the appropriate comparison is between short- and longer-term Pennsylvania residents is well-established by the foregoing body of Supreme Court precedent. Moreover, our conclusion that the appropriate penalty analysis must compare shorter-term with longer-term Pennsylvania residents has been reached by numerous other federal and state courts that have considered this precise, or substantially similar, issue.[8]

_____

8. See Roe v. Anderson, 966 F. Supp. 977, 984-85 (E.D. Cal. 1997), aff 'd, 134 F.3d 1400, 1404-05 (9th Cir. 1998), petition for cert. filed, (U.S. July 9,1998) (No. 98-97); Green v. Anderson, 811 F. Supp. 516, 521 (E.D. Cal. 1993), aff'd, 26 F.3d 95 (9th Cir. 1994), judgment vacated as unripe, 513 U.S. 557 (1995) (per curiam); Westenfelder v. Ferguson, 998 F. Supp. 146, 154 (D.R.I. 1998); Mitchell v. Steffen, 504 N.W.2d 198, 201-02 (Minn. 1993); Sanchez v. Department of Human Services, ___ A.2d ___, A-466-97T1F, 1998 WL 391584, at *5 (N.J. Super. Ct. App. Div. July 8, 1998); Brown v. Wing, 649 N.Y.S.2d 988, 995 (N.Y. Sup. Ct. 1996), aff 'd, 241 A.D.2d 956 (1997); see also Aumick v. Bane, 612 N.Y.S.2d 766 (N.Y. Sup. Ct. 1994); Robert C. Farrell, Classifications That Disadvantage Newcomers and the Problem of Equality, 28 U. Rich. L. Rev. 547, 609 (1994) (arguing that the "relevant comparison . . . [is] between newcomers and the established residents of the new state"); cf. Hicks v. Peters, ___ F. Supp. ___, No. 98C3247, 1998 WL 424176 (N.D. Ill. July 17, 1998) (declining to reach the issue of whether the Illinois durational residence statute imposes a penalty because it failed rational basis review). But cf. Jones v. Milwaukee County, 485 N.W.2d 21 (Wisc. 1992) (finding that a 60 day durational residency requirement for general relief benefits is "substantially less onerous than the one year waiting period of Shapiro, . . . does not operate to penalize an individual's right to travel," and passes rational basis review).

14

From a constitutional standpoint, it is of no consequence that the Maldonados receive the same benefits that they would have received in Puerto Rico. Pennsylvania's two-tier welfare scheme penalizes the Maldonados for having exercised their right to travel by treating them significantly less favorably than other similarly situated longer-term Pennsylvania residents solely because they exercised that right more recently.

It is well-established "that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution." Harman v. Forssenius, 380 U.S. 528, 540 (1965); accord Dunn v. Blumstein, 405 U.S. at 341. This, however, is exactly what Pennsylvania's two-tier durational residence scheme does. The $532 monthly reduction in the Maldonados' Pennsylvania benefits, based solely on their newly arrived status amounts to a 64% reduction in cash benefits and plainly penalizes them for having exercised their right to migrate into the state.

This point is further reinforced by the holdings in Zobel, Hooper, and Soto-Lopez, where the Court held unconstitutional state benefit schemes that were unique to the states involved and which did not even exist in the plaintiffs' prior state of residence. See, e.g., Soto-Lopez, U.S. 476 at 907, 911-12 ("Once [out-of-staters] establish bona fide residence in a State, they become the State's `own' and may not be discriminated against solely on the basis of [the date of] their arrival in the State. . . . For as long as [the State] chooses to offer [a benefit to its residents,] the Constitution requires that it do so without regard to [time of] residence.") (citations and internal quotations omitted); Hooper, 472 U.S. at 623 ("The State may not favor established residents over new residents based on the view that the State may take care of `its own,' if such is defined by prior residence."). Thus, from a constitutional viewpoint, the level of benefits available to the claimants in the state of their prior residence is irrelevant. What the Court found significant, however, was the difference in benefits provided to the claimants in the state of their new residence based solely on residential duration. Here too, newer residents, such as the Maldonados, plainly are "penalized" for having exercised their right to travel and migrate.

15

Thus, because Pennsylvania's durational residency requirement discriminates against newly arrived residents and penalizes their fundamental right to travel and migrate, we hold that Pennsylvania's welfare durational requirement is subject to strict scrutiny. Accordingly, to pass constitutional muster, the Commonwealth must show that the residential requirement is necessary to promote a compelling state interest and is narrowly drawn to meet that end. Partly because the Commonwealth argues that the law should be reviewed under rational basis analysis, it has not presented anything even remotely resembling a compelling interest which would justify the law or shown that it is narrowly tailored to meet its asserted ends.

First, one of the purposes of the statute articulated by the Commonwealth in the district court is to prevent Pennsylvania from becoming a "welfare magnet." The district court found this purpose clearly unconstitutional under Shapiro and its progeny. We agree, and it does not warrant additional discussion. See, e.g., Shapiro, 394 U.S. at 629. Second, the Commonwealth's argument that the purpose of the durational residency requirement,"and indeed of Pennsylvania's entire assistance program, is to encourage work and self-sufficiency over dependency," is unconvincing. Although unquestionably the encouragement of self-sufficiency and work is a laudable and legitimate state goal, the Commonwealth has not demonstrated that this is a compelling interest or that a two-tier scheme is necessary to achieve that end. Even assuming arguendo that the interest is compelling, the scheme clearly is not narrowly drawn to achieve that goal and arguably, as the district court found and as applied by the Supreme Court, is not even rationally related to that purpose.

For instance, the Commonwealth has not demonstrated why newly arrived residents are more in need of "encouragement" to join the work force than longer-term residents. If encouraging work truly were the goal, and reduced benefits during a waiting period accomplished this goal, all residents should be subject to a waiting period, not just new residents. See Shapiro, 394 U.S. at 637 ("A state purpose to encourage employment provides no rational basis for imposing a one-year waiting-period restriction on

16

new residents only."). Furthermore, the scheme does not encourage all new residents but only "encourages" those new residents who arrive from states that provide lower benefits than Pennsylvania. Moreover, and significantly, immigrants from abroad receive no encouragement for under Pennsylvania law they are eligible for the same benefits as long-term residents. Additionally, the scheme's irrationality is demonstrated by its application to persons who migrated to Pennsylvania while employed, but due to no fault of their own, such as layoffs or plant closings, became unemployed within their first twelve months in the state. The law's irrationality is further highlighted as the scheme applies even to those certified by the Commonwealth as being temporarily or permanently physically disabled or otherwise incapable of working, such as the Maldonados. There simply is no rational reason, let alone a compelling reason, to assume that only new residents from states that offer lesser benefits than Pennsylvania need "encouragement" to seek work and self-sufficiency.

Amici curiae's proffered reason, that the scheme is justified by differing expectation and reliance interests--i.e., newcomers can more easily adjust to cuts in welfare benefits through their choice of communities and lifestyles than longer-term residents who expect to have, and rely on, the safety net of higher benefits--is not sufficiently compelling. Even if we assume that many newer residents can more easily adjust their lifestyles to reduced benefits than those with longstanding ties to a particular area, an assumption that is highly speculative, the Commonwealth again has not demonstrated a compelling interest that justifies what may amount to a greater than 60% reduction in an indigent family's cash benefits required to purchase many of life's necessities.

Furthermore, the legislative scheme is not narrowly tailored to meet this purpose, as it does not take into account the myriad of differences in individual personal and financial situations. For example, most people who own homes, those who have fixed residential lease obligations, or those who have countless other longer-term financial obligations can less easily adjust to reduced benefits

17

compared to those persons without similar obligations. The Commonwealth could use means, need-based, or other testing to determine if a particular applicant actually can adjust to reduced welfare benefits. Under any of numerous scenarios, it is likely that an eleven-month resident of Pennsylvania who unexpectedly finds herself in need of welfare benefits will find it just as difficult to survive on reduced benefits as will a twelve-month resident. Amici curiae have presented no compelling reason to assume that all newer residents, and only newer residents, are more able to easily adjust to and survive on reduced welfare benefits, nor have they demonstrated that the scheme is narrowly tailored to affect only those able to adjust to and survive on reduced welfare benefits. Thus, it is obvious that the Commonwealth (and Amici) has failed to demonstrate that its twelve-month durational residency requirement is necessary to promote a compelling state interest, or that the legislation is narrowly drawn to meet its stated objections.

We agree with the district court that there is no constitutional right to welfare benefits, Dandridge v. Williams, 98 U.S. 471, 485 (1970), and none is claimed. We are also aware of a state's legitimate interest in preserving public funds. When, however, a state makes welfare benefits available for its indigent, Shapiro and Maricopa County make it clear that the preservation of the public fisc may not be achieved by an invidious distinction between classes of its citizens.

We are mindful, however, as explained by the district court, that the opinions in several Supreme Court cases decided since Shapiro and Maricopa County may call into question the vitality of strict scrutiny review of laws that burden the fundamental right to interstate travel and migration. Nevertheless, the Supreme Court has periodically admonished lower federal courts, and has recently "reaffirm[ed] its rule that `if a precedent of th[e Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions.' " See Agostini v.

18

Felton, 117 S. Ct. 1997, 2017 (1997) (quoting Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989)). Because Shapiro and Maricopa County have never been overruled by the Court, we follow the Court's directive and conclude that they dictate the result of this case.9 We note, however, that our opinion is in no way meant to pass judgment on the wisdom or desirability of the Pennsylvania legislature's attempt at welfare reform.

III.

In conclusion, we affirm the district court's order that the Maldonados have shown that they were likely to succeed in proving that Commonwealth's twelve-month durational residence requirement is unconstitutional. Thus, the court's grant of a preliminary injunction was not an abuse of discretion. We conclude, however, that the court erroneously subjected the law to rational basis analysis instead of the requisite strict scrutiny. The Commonwealth has not demonstrated that the scheme is necessary to promote a compelling state interest, or that it is narrowly

_____

9. On appeal, the Maldonados once again argue that Section 9(5)(ii) violates the Privileges and Immunities Clauses of Article IV and the Fourteenth Amendment. As shown by the almost complete lack of citation to authority in their brief, this argument is almost completely without merit. But see Zobel, 457 U.S. at 71-81 (O'Connor, J. concurring) (finding the right to travel rooted in the Privileges and Immunities Clause). The Supreme Court has consistently interpreted Article IV, S2--the Privileges and Immunities Clause--to be a limit on the ability of a state to discriminate against out-of-state residents. The Clause, "in effect, prevents a State from discriminating against citizens of other States in favor of its own." Hague v. Committee for Indus. Org., 307 U.S. 496, 511 (1939). As a necessary prerequisite for the Privileges and Immunities Clause to apply, it must be shown that a state discriminated against a citizen of another state. See, e.g, United Bldg. & Constr. Trades Council v. Mayor and Council of Camden, 465 U.S. 208, 218 (1984); Zobel, 457 U.S. at 59 n.5. Here, by contrast, the Pennsylvania statute is applicable only to bonafide Pennsylvania-state residents and does not discriminate against nonresidents in any way. The only way to fall under the challenged scheme is to first become a resident of the Commonwealth of Pennsylvania. Accordingly, the Privileges and Immunities Clause has no application to the issues presented by this appeal.

19

tailored to accomplish its stated goal. Accordingly, we hold that Pennsylvania's two-tier durational residency requirement for welfare benefits is unconstitutional as it is based solely on a citizen's length of residing in the state; the scheme impermissibly penalizes citizens who have exercised their fundamental right to travel and migrate interstate, and thus violates the Equal Protection Clause of the Fourteenth Amendment.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit