**KHODARA ENVIRONMENTAL, INC., general partner, on Behalf of EAGLE ENVIRONMENTAL, L.P., Plaintiff,**

v.

**Steven BECKMAN, et al., Defendants.**

No. CIV.A.97–93.

United States District Court, W.D. Pennsylvania.

March 31, 1999.

John P. Krill, David R. Overstreet, Carleton O. Strouss, Kirkpatrick & Lockhart, Harrisburg, PA, for Khodara Environmental, Inc.

Thaddeus A. Weber, Pennsylvania Dept of Environmental Protection, Meadville, PA, for Steven Beckman.

Marsha S. Edney, Sandra M. Schraibman, Dept. of Justice, Civ. Div., Washington, DC, James S. Dillman, F.A.A. Washington, DC, for F.A.A.

Thomas L. Wenger, Steven R. Williams, Wix, Wenger & Weidner, Harrisburg, PA, Robert P. Ging, Jr., Confluence, PA, for Clearfield–Jefferson Counties Regional Airport Authority.

Thomas L. Wenger, Steven R. Williams, Wix, Wenger & Weidner, Harrisburg, PA, for Donald R. Johnson, Paul Sekula, William Miksich, Frederick G. Murray, Tim Morgan, Robert E. Reitz, Henry Deible, Paul McMillen, Mark McKinley.

Robert P. Ging, Jr., Confluence, PA, for Jefferson County and Pine Creek Tp.

### MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Plaintiff Khodara Environmental, Inc., general partner acting on behalf of Eagle Environmental, L.P. (collectively referred to as "Eagle" or "Plaintiff") commenced the instant action on April 25, 1997 seeking, primarily, a declaration that Section 1220 of the Federal Aviation Reauthorization Act of 1996, *as amended,* 49 U.S.C. § 44718(d) (hereinafter, the "FAA Amendment") is unconstitutional. Plaintiff has named various local, state and federal entities and/or officials as Defendants. The dispute arises out of Eagle's as yet unsuccessful efforts to construct and operate a landfill on property located in Jefferson County, Pennsylvania near the Dubois–Jefferson County Airport.

Presently pending before the Court are multiple motions and cross-motions for summary judgment filed by the parties and a motion to dismiss filed by Intervenors Jefferson County and Pine Creek Township. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. As explained in more detail below, we conclude that the FAA Amendment violates principles of equal protection and that Plaintiff is therefore entitled to partial summary judgment.

### I. BACKGROUND[1]

*A. The Parties*

Plaintiff Khodara Environmental, Inc. is a corporation organized under the laws of Delaware. It is the general partner of Eagle Environmental, L.P., a limited partnership operating out of Englewood Cliffs, New Jersey.

Defendant Steven Beckman is the Regional Director of the Northwest Regional Office of the Commonwealth of Pennsylvania, Department of Environmental Protection ("DEP").

Defendant Jane F. Garvey is the Administrator of the Federal Aviation Administration ("FAA"). Defendant FAA is the agency of the federal executive branch that is charged with, among other things, promoting the safety of air transportation and airport operations. (We refer to these Defendants collectively as the "FAA.")

---

1. The following facts are not genuinely undisputed, except to the extent indicated below.

Defendant Clearfield–Jefferson Counties Regional Airport Authority (the "Authority") is a municipal authority formed under the laws of the Commonwealth of Pennsylvania. It is the entity responsible for operation of the Dubois–Jefferson County Airport (hereinafter, the "Airport"). The Airport is located in Jefferson County, near Dubois, Pennsylvania and is jointly owned by Jefferson and Clearfield Counties. The Authority, acting through its Board of Directors, is generally responsible for making decisions concerning the administration of the Airport, including operations, airport safety, and capital improvements. Defendants Donald R. Johnson, Paul Sekula, William Miksich, Mark McKinley, Frederick G. Murray, Tim Morgan, Robert E. Reitz, Henry Deible, and Paul McMillen are individuals who, at all times relevant to this action, served as members of the Authority's Board of Directors.

In addition to the foregoing parties, both Jefferson County and Pine Creek Township have been granted permission to participate as Intervenors in this case. (They are referred to collectively hereafter as the "Intervenors.")

### B. The Happy Landing Landfill

Eagle owns, or otherwise has an interest in, approximately 680 acres of land in Washington Township, Jefferson County, Pennsylvania (hereinafter, the "Property"). Eagle's intention was to develop a solid waste disposal facility on the Property which would be known as the "Happy Landing Landfill" (the "Landfill"), and which would serve as a depository for municipal waste generated in regions with a scarcity of available landfill space. These regions are generally outside Pennsylvania and include the New York City metropolitan area. The Landfill site is located approximately 5.25 miles from the Airport.

In November 1990, Eagle began to apply for a series of permits from the DEP [2] consistent with its plan to develop the Landfill.[3] The DEP initially issued all of the permits necessary for construction and operation of the Landfill in 1996.[4] On February 9, 1996, the DEP issued four permits to Eagle, namely: (i) a Water Obstruction and Encroachment Permit which permitted, *inter alia*, the filling of certain wetlands; (ii) a National Pollutant Discharge Elimination System ("NPDES") Permit, which authorized the discharge of treated industrial wastewater (primarily from landfill leachate) into waters of the Commonwealth; (iii) a Solid Waste Permit, which authorized the construction and operation of the Landfill; and (iv) an Air Quality Permit, which authorized certain air emissions related to operation of the Landfill. The DEP's issuance of the Solid Waste Permit was subsequently appealed to the Pennsylvania Environmental Hearing Board (the "EHB") by the Jefferson County Commissioners, the County Solid Waste Authority, Washington Township, and about 200 individuals and organizations. These appeals were consolidated at EHB No. 96–061–MG and have not yet been resolved. On August 15, 1996, the

2. At the time Eagle filed its application, the DEP was actually operating as the "Department of Environmental Resources." The Department was renamed the "Department of Environmental Protection" effective July 1, 1995. *See* 71 P.S. § 1340.501(West Supp. 1998). For the sake of convenience, we will refer to the Department at all times as the DEP.

3. While Plaintiff contends that it applied for the requisite permits in November 1990, the Intervenors contend that the version of the permit application which supported the issuance of the Landfill and associated permits was not submitted in final and complete form until February 7, 1995. For present purposes we do not view this dispute as material.

4. Eagle contends that the last of the necessary permits was issued to it in February 1996. Intervenors claim that Eagle did not receive all permits necessary for the construction and operation of the Happy Landing Landfill until August 15, 1996. Again, we do not consider this dispute to be material. It is undisputed that the necessary permits were initially issued prior to September 1996.

DEP issued to Eagle another permit known as a Water Quality Management Permit. This permit, which was issued under the Pennsylvania Clean Streams Law, authorized Eagle to construct landfill leachate treatment facilities.

Upon being initially permitted, Eagle undertook some measures to develop the Landfill. While the parties disagree on the extent to which Eagle actually commenced "construction" of the Landfill, this disagreement is for the most part a dispute more of semantics than of facts.[5] For example, it appears to be undisputed that Eagle obtained engineering studies and undertook steps to install eleven monitoring wells. However, Eagle apparently has not yet installed primary or secondary liners for the Landfill, has not installed leachate collection or management systems, and has not constructed and/or installed permanent access roads, borrow pits, sedimentation ponds, or scales for the Landfill. Eagle also has not submitted to the DEP a certification by a registered professional engineer for any major construction at the Landfill site. Needless to say, the Landfill has not yet become operational in terms of actually accepting waste for disposal at the site.

In September 1996, the Pennsylvania Fish and Boat Commission designated three tributaries near the Landfill site as wild trout streams. On the basis of this designation, the DEP determined that certain wetlands were of "exceptional value"

due to the relationship between these wetlands and the trout streams. This in turn led the DEP to conclude that Eagle's plan to construct and operate the Landfill should not have been permitted as proposed.

Accordingly, on September 25, 1996 Defendant Beckman, on behalf of the DEP, issued an administrative order modifying the Water Obstruction and Encroachment Permit by revoking the authorization to fill in any wetlands. The order also suspended the Solid Waste Permit, the Air Quality Permit, the NPDES Permit and the portion of the Encroachment Permit that had not been modified. This suspension order became the subject of an appeal before the Environmental Hearing Board styled *Eagle Environmental L.P. v. Commonwealth of Pennsylvania Department of Environmental Protection*, EHB Docket No. 96–215–MG. On November 18, 1996, the EHB stayed consideration of most of the issues involved in the appeals docketed at No. 96–061–MG pending resolution of Eagle's suspension appeal at EHB No. 96–215–MG; thus most of the issues involved in the former appeals matter will be heard and considered after the appeal at EHB No. 96–215–MG is resolved. As of June 1997, Plaintiff estimated that the cost of pursuing these appeals would likely exceed $150,000. (*See* Affid. of Jacques Khodara dated 6/5/97, Pl.'s Resp. to Def. Beckman's Mot. to Dismiss [Doc. No. 39], Ex. A at Par. 19.)[6]

---

**5.** One area of factual disagreement concerns the construction of initial roads at the Landfill site. Eagle characterizes these as "initial access roads" which (according to Eagle) evidence its assertion that the Landfill is partially constructed. Intervenors deny that the roads were built for purposes of the Landfill. They claim that in fact the roads were built for the benefit of a waste hauling business known as J.P. Mascaro & Sons. Intervenors also dispute Eagle's description of the Landfill as "partially constructed." For present purposes, the precise nature and/or purpose of the initial roads is not material. In any event, however, having viewed Intervenors' evidence, the Court does not agree that the In-

tervenors have demonstrated a genuine issue of fact as to this point.

**6.** Eagle also brought an action against the Pennsylvania Fish & Boat Commission in the Commonwealth Court of Pennsylvania challenging the legality of the study upon which the DEP determined to suspend Eagle's Solid Waste Disposal Permit. The Commonwealth Court dismissed Eagle's action on preliminary objections and, as of June 1997, an appeal of the dismissal was pending in the Pennsylvania Supreme Court. Plaintiff estimated as of June 1997 that the cost of pursuing this litigation would likely exceed $40,000. (*See* Affid. of Jacques Khodara dated 6/5/97, Pl.'s Resp.

On February 7, 1997 Eagle entered into a Consent Order and Agreement ("CO & A") with the DEP which allowed for the release of bonds that Eagle had submitted in connection with its Solid Waste Permit. Under the CO & A, Eagle agreed that it "shall not construct or operate the Happy Landing Landfill until and unless the [Solid Waste] Permit is reinstated and the bonding requirements of the [Solid Waste Management Act] are met." (Def. Beckman's Cross–Mot. for Summ. Judg. [Doc. No. 74] at Ex. A, Attachment 3.) [7] All of Eagle's DEP-issued permits relative to the Happy Landing Landfill remain suspended by virtue of the DEP's September 25, 1996 administrative order, which was affirmed by the EHB in a ruling dated September 3, 1998.[8]

## C. FAA Order 5200.5A and the "Leatherwood Landfill"

As part of its mission to promote safety in air traffic and airport operations, the FAA has determined that municipal solid waste landfills attract birds, and that municipal solid waste landfills located in the vicinity of airports increase the potential for bird strikes. Accordingly, Order 5200.5A was promulgated by the FAA to provide guidance regarding the potential safety concerns of landfills located in the vicinity of airports. Specifically, FAA Order 5200.5A states that landfills are not compatible to the safety of an airport when:

a. waste disposal sites are located within 10,000 feet of any runway end used or planned to be used by turbine powered aircraft.

b. waste disposal sites are located within 5,000 feet of any runway end

used only by piston powered aircraft.

c. any waste disposal site located within a five mile radius of a runway end that attracts or sustains hazardous bird movements from feeding, water or roosting areas into, or across the runways and/or approach and departure patterns of aircraft.

(See Ex.s in Supp. of Pl.'s Mot. for Summ. Judg. [Doc. No. 60] at Ex. 1–C.) The criteria set forth in Order 5200.5A comport with the FAA's administrative regulations. See 14 C.F.R. Pt. 77. They have also been incorporated into the U.S. Environmental Protection Agency's regulations concerning landfills. See 40 C.F.R. § 258.10.

In May 1997 the FAA issued an Advisory Circular regarding the hazardous wildlife attractants on or near airports. See 60 Fed.Reg. 270805 (May 25, 1995). The Advisory Circular supersedes Order 5200.5A, but incorporates criteria identical to those set forth in Order 5200.5A for the location of landfills near airports. The Circular also sets forth procedures that the FAA will follow when notified that a landfill is proposed to be situated within the relevant distance parameters from an airport. The procedures set forth in the Circular essentially are a memorialization of the procedures that the FAA followed pursuant to Order 5200.5A. They provide that, when a landfill is proposed near the location of an airport, the FAA determines whether the use is compatible with the safety of the airport by evaluating, inter alia, the distance that the proposed landfill site is from the airport. If an expansion of the airport runways is contemplated, the FAA includes that increased area in its calculation. When the proposed site falls within

to Def. Beckman's Mot. to Dismiss [Doc. No. 39], Ex. A at Par. 22.)

**7.** While Eagle alleges that the CO & A "suspended" construction which had already commenced at the Landfill site, Intervenors dispute this characterization. They claim that construction was never actually started and, therefore, the CO & A did not "suspend"

construction but rather, precluded the commencement of construction. This disagreement is essentially semantical and is not material to our disposition of these motions.

**8.** Eagle has apparently taken a further appeal of EHB No. 96–215–MG to the Pennsylvania Commonwealth Court.

siting criterion 7(c), as part of a compatibility determination the FAA also evaluates whether the geographical location of the landfill is such that it falls within the traffic patterns for the type or the category of aircraft that the airport serves. As part of its compatibility determination, the FAA may examine bird migration patterns within that area and the geographic location of the airport (for example, distance to a water body). When the FAA determines that a municipal solid waste landfill location falls within siting criteria 7(a) or 7(b) set forth in Order 5200.5A, it regularly objects to the landfill location as incompatible with the safety of the airport.

In or around January 1991 the FAA received information that an entity known as Leatherwood, Inc. had submitted a request to the DEP for a permit to operate a landfill (the "Leatherwood Landfill") in Pinecreek Township, Jefferson County, Pennsylvania, near the Dubois–Jefferson County Airport. The FAA determined that the proposed location was within five miles of the Airport and was beneath the centerline extended from one of the Airport's runways, so that aircraft approaching to land on that runway could be expected to pass over the Leatherwood Landfill location at altitudes that would result in an increased potential for bird strikes. The FAA concluded that, because the proposed location was beneath the approach course (centerline extended) to a runway, the development of the Leatherwood Landfill would significantly increase the risk of an aircraft bird strike. Accordingly, it submitted comments to the DEP expressing these concerns and recommending that the DEP deny the permit application for the Leatherwood Landfill because it was within the distance restrictions of Order 5200.5A.

The Happy Landing Landfill, in contrast to the Leatherwood Landfill, is approximately 5.25 miles from the Airport and is not situated beneath the approach course to any of the Airport's runways. Consequently, aircraft on final approach to the Airport would not be expected to pass over the Happy Landing Landfill site, whether operating under visual flight rules or instrument flight rules. The FAA admits that, because the Happy Landing Landfill site is located outside of the restrictive criteria set forth in FAA Order 5200.5A, it would not have been the subject of an FAA compatibility study.

D. *Section 1220 of the Federal Aviation Reauthorization Act of 1996*

On October 9, 1996, the Federal Aviation Reauthorization Act of 1996 was enacted into law. Pub.L. No. 104–264. Section 1220 of the Act, which is the focus of this lawsuit, states as follows:

(a) Landfills: [49 U.S.C.] Section 44718 is amended by adding at the end the following:

(d) Landfills: For the purpose of enhancing aviation safety, in a case in which 2 landfills have been proposed to be constructed or established within 6 miles of a commercial service airport with fewer than 50,000 enplanements per year, no person shall construct or establish either landfill if an official of the Federal Aviation Administration has stated in writing within the 3–year period ending on the date of enactment of this subsection that 1 of the landfills would be incompatible with aircraft operations at the airport, unless the landfill is already active on such date of enactment or the airport operator agrees to the construction or establishment of the landfill.

(b) Civil Penalties: [49 U.S.C.] Section 46301 is amended by inserting 44718(d) after 44716, in each of subsections (a)(1)(A), (d)(2), and (f)(1)(A)(i).

As is evident from its language, Section 1220 (hereinafter, the "FAA Amendment") purports to grant the airport operator the power to circumvent the restrictions set forth in the Amendment by agreeing to

allow construction or establishment of the otherwise prohibited landfill. The FAA does not interpret the Amendment as conferring upon it any authority to conduct a compatibility determination as to any airport that falls within the purview of the FAA Amendment.

On October 21, 1996, Defendant Beckman sent a letter to Jacques Khodara, president of Khodara Environmental, Inc., informing him of the FAA Amendment and the fact that permits previously issued for the Leatherwood Landfill had been suspended on the basis of the statute. Beckman's letter further advised that:

> [t]he Department's future action regarding reinstatement and/or modification of Eagle Environmental's currently suspended permits will be governed by the same criteria applicable to Leatherwood, Inc. Thus, if Eagle seeks reinstatement or modification pursuant to the Department's September 25th Order, Eagle Environmental should also indicate to the Department how it intends to comply with Section 1220(a) of the Federal Aviation Reauthorization Act of 1996 [49 U.S.C. § 44718(d) ].

(Def. Beckman's Cross Mot. for Summ. Judg. [Doc. No. 74] at Ex. A, Attachment 2.) [9]

Thereafter, Eagle sought permission from the Authority to construct and operate the Landfill. By letter dated November 20, 1996, Eagle formally requested that the Authority agree to the construction and operation of Happy Landing Landfill. On November 22, 1996 the Authority responded with a letter notifying Eagle that it would accept written documentation relative to Eagle's request for a period of 30 days. Eagle was further notified that written documentation would be accepted during that same time period from other interested parties as well and that all of the documentation would be made public. Eagle provided documentation to the Authority in support of its request on or about December 23, 1996. The documentation consisted of fourteen exhibits and exceeded 125 pages.

At a public meeting held on January 24, 1997 the Authority unanimously decided to deny Eagle's request. In its resolution denying the request, the Authority justified its decision by adopting and incorporating the substantive portions of an attached letter from the Authority's legal counsel. The letter, as incorporated into the resolution, stated in relevant part that: "[t]he absence of specific criteria in the applicable federal legislation for determining the grant or denial of consent by the Authority suggests a broad range of discretion in the Authority to make such a determination." (Pl.'s Ex. 19.)

### E. The Litigation

Plaintiff commenced the instant action on April 25, 1997 by filing a five-count complaint. Count I alleges that the FAA Amendment is facially invalid because it amounts to an unconstitutional delegation of legislative authority. Count II asserts a challenge to the Amendment on the ground that it is an unconstitutional Bill of Attainder. Count III challenges the statute on the ground that it violates Plaintiff's rights under the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiff's first three claims, which involve purely facial challenges to the FAA Amendment, are asserted only against Defendants Beckman, the FAA and Garvey.[10] Count IV of the Complaint is directed against the Airport Authority and its board members in their individual and official capacities. This cause of action asserts that the Defendants' application of

---

9. Although Eagle initially attempted to appeal Beckman's letter to the EHB, it later consented to a dismissal of the appeal.

10. These claims were originally asserted against all Defendants. However, by order dated September 23, 1997, this Court dismissed Counts I, II, and III to the extent they were asserted against the Airport Authority and the individual members of its Board of Directors.

the statute violated Eagle's constitutional rights to substantive and procedural due process, equal protection of the laws, and freedom from the taking of its property without just compensation. Plaintiff's fifth claim asserts that the FAA Amendment is inapplicable to the Happy Landing Landfill as a matter of statutory construction. Under this count, which is asserted against all Defendants, Plaintiff contends that the statute by its terms is inapplicable to Happy Landing Landfill because the Landfill was not "proposed to be constructed or established," but rather, was "already active," on the date of the enactment of the FAA Amendment. Plaintiff has sought various forms of relief including, *inter alia,* declaratory judgment on all counts, injunctive relief, and compensatory and punitive damages.

On May 16, 1997 Defendant Beckman filed a motion to dismiss the case, asserting that this Court lacks Article III jurisdiction over the instant matter and further arguing that Plaintiff could not demonstrate that the claims directed against him were properly raised before this Court. Arguments on Beckman's motion were entertained during a telephonic conference held on September 23, 1997. At the conclusion of the conference, the Court rendered a ruling denying Beckman's motion.

Plaintiff subsequently filed a motion for partial summary judgment as to Counts I, II and III of its Complaint. The FAA and Intervenors have filed cross-motions for summary judgment on these same counts, seeking a ruling by this Court that the FAA Amendment is constitutional. Intervenors have also filed a separate motion to dismiss this case on the grounds of mootness and/or lack of ripeness. Defendant Beckman has filed a motion for summary judgment in which he renews the arguments set forth in his previous motion to dismiss and further argues in favor of summary judgment on the basis of Eleventh Amendment Immunity and/or abstention. Finally, the Airport Authority and its Board Members have moved for summary judgment as to Counts IV and V. These motions have been fully briefed and argued and are now ripe for disposition.

## II. STANDARD OF REVIEW

Because the instant motions raise challenges both to this Court's subject matter jurisdiction and to the sufficiency of the evidence, we set forth the applicable standards of review under both Rules 12(b)(1) and 56 of the Federal Rules of Civil Procedure.

Under Fed.R.Civ.P. 56, summary judgment may be granted only if we conclude that the pleadings, depositions, answer to interrogatories and admissions on file, together with the affidavits, show that the party moving for summary judgment is entitled to judgment as a matter of law and that there are no genuine disputes of material fact precluding entry of judgment. Fed.R.Civ.P. 56(c). In entertaining a motion for summary judgment, we must construe the facts and the reasonable inferences arising therefrom in the light most favorable to the non-moving party. *Seitzinger v. Reading Hosp. and Medical Center,* 165 F.3d 236, 238 (3d Cir.1999); *Gallo v. City of Philadelphia,* 161 F.3d 217, 219 (3d Cir.1998).

Dismissal for lack of subject matter jurisdiction is appropriate only if the right claimed is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Growth Horizons, Inc. v. Delaware County, Pa.,* 983 F.2d 1277, 1280–81 (3d Cir. 1993) (quoting *Kulick v. Pocono Downs Racing Ass'n,* 816 F.2d 895, 899 (3d Cir. 1987)). The plaintiff bears the burden of persuasion on a motion under Rule 12(b)(1). *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). When there is a factual question about whether a court has jurisdiction, the trial court may examine facts outside the pleadings and thus "proceed as it never could under [Fed.R.Civ.P.]

12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case." *Robinson v. Dalton,* 107 F.3d 1018, 1021 (3d Cir.1997) (quoting *Mortensen v. First Federal Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)). In such circumstances, a trial court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* (quoting *Intern. Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc.,* 673 F.2d 700, 711 (3d Cir.1982)). Unlike the procedure governing summary judgment, under a Rule 12(b)(1) motion to dismiss "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* (quoting *Mortensen,* 549 F.2d at 891).

## III. DISCUSSION

### A. Jurisdictional Challenges: Standing, Ripeness and Mootness

Initially, we must address certain jurisdictional challenges to Plaintiff's claims. For proper context, we review some basic Article III jurisprudential principles and set forth the relevant procedural history.

Article III of the United States Constitution gives federal courts jurisdiction over various types of "cases" and "controversies," including those that arise under the Constitution. U.S. Const., art. III, § 2. This "cases and controversies" requirement was intended to ensure that federal courts decide only those disputes that are "properly resolved through the judicial process," *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citation omitted), and refrain from issuing opinions which are merely advisory in nature. *Armstrong World Indus., Inc. v. Adams,* 961 F.2d 405, 410 (3d Cir.1992) (citations omitted). The requirement has engendered "numerous justiciability doctrines that further define the limits of federal jurisdiction," two of which are "standing" and "ripeness." *Id.* at 411. Although these concepts are sometimes confused, "standing" is concerned with *who* may bring an action, while "ripeness" addresses the timing of an action, i.e., *when* the action may be brought. *Id.* at 411 n. 13.

■ In order to establish proper standing, a plaintiff must demonstrate (i) an "injury in fact," (ii) a causal connection between the injury and the conduct complained of, and (iii) a "likelihood," as opposed to mere "speculation," that the injury will be "redressed by a favorable decision." *Defenders of Wildlife,* 504 U.S. at 560–61, 112 S.Ct. 2130; *Artway v. Attorney General of State of New Jersey,* 81 F.3d 1235, 1246 (3d Cir.1996). The requirement of "injury in fact" has been defined as "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) 'actual or imminent, not conjectural or hypothetical.'" *Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130 (citations omitted).

■ The basic rationale of ripeness is to "prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agricultural Prod. Co.,* 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (citation omitted). Courts have established a two-part test for determining ripeness; first, they consider whether the issues are fit for judicial resolution, and secondly, they examine whether withholding judicial resolution will result in hardship to the parties.[11] *Abbott Laboratories*

---

11. In this circuit, a more "refined" test is used in the context of declaratory judgment actions, "because declaratory judgments are typically sought before a completed injury has occurred." *Pic–A–State Pa., Inc. v. Reno,* 76 F.3d 1294, 1298 (3d Cir.), *cert. denied,* 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996). However, the inquiry remains essentially the same. In determining the ripeness of a declaratory judgment action, the Third Circuit requires us to consider (i) whether the requisite adversity of interests exists, (ii) the

v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); New Hanover Twp. v. United States Army Corps of Engineers, 992 F.2d 470, 472 (3d Cir.1993).

### (1) Defendant Beckman's Motion to Dismiss

In May 1997 Defendant Beckman filed a motion to dismiss this case under Fed. R.Civ.P. 12(b)(1) contending that this Court lacks jurisdiction over the instant matter because there is no "case or controversy." Beckman argued both that Eagle lacked standing to bring the instant action and that its claims were not yet ripe because the FAA Amendment had not been formally enforced as to Eagle.

With respect to the first point, Beckman claimed that Plaintiff could not demonstrate an "injury in fact" because the DEP had not taken any formal action toward applying the FAA Amendment to the Happy Landing Landfill. The letter of October 21, 1996, it was argued, did not represent any formal action or adjudication by the Department, although it apprised Eagle of the potential need in the future to demonstrate compliance with the Act. Aside from the lack of any formal DEP enforcement action, Beckman pointed out that the Landfill's completion and operation had been forestalled, even prior to enactment of the FAA Amendment, on the basis of unrelated state permit disputes. Further, by virtue of the February 7, 1997 CO & A, Eagle has agreed that it cannot not construct or operate the Landfill until and unless its Solid Waste Permit is reinstated and it has satisfied the bonding requirements under the Pennsylvania Solid Waste Management Act, as amended, 35 P.S. 6018.101 et seq. Based on all of these factors, Beckman argued that Eagle cannot demonstrate any injury, as a result of the FAA Amendment, that is "actual or imminent."

Beckman also challenged the ripeness of Eagle's lawsuit for similar reasons. He asserted that the matter was not fit for judicial resolution because a ruling on the FAA Amendment's constitutionality would not change the fact that Eagle's state permits are currently suspended. He urged that the hardship factor also was not satisfied because, without the necessary permits to operate the Happy Landing Landfill, Eagle could not assert that a hardship is certain and impending.

In support of his motion to dismiss, Beckman relied principally on New Hanover Twp. v. United States Army Corps of Engineers, 992 F.2d 470 (3d Cir.1993), arguing that New Hanover controls the outcome of this action. In New Hanover, a corporate entity, New Hanover Corporation ("NHC"), sought to use land to develop a municipal landfill. It applied for and received a general nationwide permit from the Army Corps of Engineers ("COE"), which allowed NHC to discharge dredged or fill materials into certain waters and wetlands. The COE issued the permit pursuant to its authority under the Federal Water Pollution Control Act (or "Clean Water Act"), 33 U.S.C. §§ 1251 et seq. In order to construct and operate the landfill, however, NHC still needed to obtain a water quality certificate from the state Department of Environmental Resources. Despite this contingency, the Township of New Hanover and various other interested parties filed an action challenging the COE's decision to issue a general nationwide, rather than an individual, permit. The district court entered judgment for the COE but, on appeal, the Third Circuit dismissed the case for lack of ripeness. Taking a "pragmatic view," the court found that the case was not fit for judicial resolution. It observed that the COE's decision had no immediate impact on the plaintiffs because, in any event, NHC could not proceed with its landfill unless

potential conclusiveness of a judgment, and (iii) whether a judgment would have any

practical utility. Id.

and until it obtained a water quality certificate from the state agency. The court was also concerned that, if it were to find in favor of the plaintiffs on appeal and thus order NHC to begin the individual permitting process, and if the state agency were to subsequently deny NHC a water quality permit, then the court would have "needlessly interposed an extra layer of administrative proceedings in th[e] matter." 992 F.2d at 473. As to the second prong—hardship to the parties—the court reasoned that no hardship would result if it refused to hear the case. Because NHC could not begin construction without the state water quality certificate, and as the possibility remained that the certificate might not be granted, the court found that there was no "certain and impending" hardship to the plaintiffs by refusing to review the challenge to the COE's permit grant. *Id.* Instead, the court opined that the plaintiffs "should wait until Pennsylvania makes its decision and then, assuming that injury is impending, file suit." *Id.* Beckman argued that this action is similarly unripe because the effect of the FAA Amendment on Eagle's landfill would not be known unless and until the EHB reinstates Eagle's permits.

Eagle, of course, opposed Beckman's motion to dismiss. In support of its argument that Article III jurisdiction exists, Eagle submitted an affidavit from Jacques Khodara, President of Khodara Environmental, Inc. Khodara's June 5, 1997 affidavit attests that, as of that date, Eagle had spent approximately $2.9 million to develop the Happy Landing Landfill. (*See* Pl.'s Resp. to Def. Steven Beckman's Mot. to Dismiss [Doc. No. 39], Ex. A at ¶ 10.) Noting that Eagle had been in litigation concerning the administrative appeals before the EHB at Docket Nos. 96–215–MG and 96–061–MG (*see id.* at ¶¶ 13–18), Khodara estimated that the cost of pursuing these appeals would likely exceed $150,-000. (*Id.* at ¶ 19.) He also stated that Eagle had commenced litigation challenging the Pennsylvania Fish & Boat Commission's study relating to wild trout streams near the Landfill site. (*Id.* at ¶ 20.) Although the case had initially been dismissed, Eagle had appealed the dismissal and the case was then currently before the Pennsylvania Supreme Court on appeal. (*Id.* at ¶ 21.) Khodara estimated that the cost of pursuing this litigation would likely exceed $40,000. (*Id.* at ¶ 22.) Perhaps most significantly, Khodara asserted that, regardless of the outcome of these legal proceedings, Eagle intended to complete the Happy Landing Landfill—if necessary, by modifying its permit application and redesigning the Landfill so as to comply with the DEP's September 25, 1996 suspension order. (*Id.* at ¶¶ 23–24.) Khodara estimated that such an undertaking would take between nine and twelve months and would cost between $250,000 and $300,000. (*Id.* at ¶¶ 24–25.)

In arguing that the case was ripe for consideration, Plaintiff primarily relied on two cases, *Triple G Landfills, Inc. v. Board of Commissioners of Fountain Cty., Indiana,* 977 F.2d 287 (7th Cir.1992) and *Gary D. Peake Excavating Inc. v. Town Bd. of the Town of Hancock,* 93 F.3d 68 (2d Cir.1996). In *Triple G,* the plaintiff was a prospective landfill operator who brought suit to challenge the validity of a local ordinance which had been passed by the county board of commissioners. The ordinance essentially provided that, after a prospective landfill operator had obtained the required permit from the state environmental agency, the operator would then need to obtain an additional county permit in order to construct and operate a landfill within the county. The ordinance created permitting restrictions that were far more stringent that those imposed by the state and, as applied to the plaintiff, it effectively precluded the plaintiff from being able to build or operate a landfill anywhere in the county. In affirming the district court's entry of summary judgment in favor of the plaintiff, the Seventh Circuit Court of Appeals rejected the defendants' challenge on ripeness grounds. The court

found that the issues were fit for judicial resolution because the plaintiff's claims mounted a purely facial attack to the ordinance and the issues posed were therefore purely legal. 977 F.2d at 289. The court also found that the hardship to the plaintiff of delaying review weighed in favor of a finding of ripeness:

Reviewing the ordinance at this time would permit Triple G to make an informed decision regarding the future of the Fountain County tract. If we uphold the ordinance, Triple G will know that it should proceed no further and cut its losses; if we invalidate the ordinance, Triple G could initiate the [state] permitting process with the confidence that obtaining a state permit would not be in vain. Postponing judicial action, in contrast, would force an unwarranted dilemma upon Triple G: either scuttle its development plans altogether in deference to a potentially invalid county regulation, or complete the expensive and time-consuming state permit process, submit a permit application that Fountain County is certain to reject, and then, after incurring substantial sunk costs, bring a facial challenge to the ordinance.... We call the dilemma unwarranted because there is no countervailing benefit—either to the judicial process or the public interest—that would attend such a postponement.... These consideration suggest that this dispute is ripe for judicial action.

977 F.2d at 290 (internal citations omitted).

In *Gary D. Peake*, the plaintiffs were a commercial demolition and excavation business and its principal ("Peake"), who sought to construct and operate a landfill for construction and demolition ("C & D") debris. The plaintiffs applied for a state permit to construct the landfill on Peake's property located in the Town of Hancock, New York. The following month, the Town Board enacted a law that essentially precluded the plaintiffs from operating the prospective landfill on Peake's property and substantially limited the amount of C

& D debris that the plaintiffs could dispose of within the town limits. The plaintiffs filed suit challenging the ordinance on constitutional grounds. On appeal following a partial grant of summary judgment in favor of the plaintiffs, the defendants argued that the claims were not ripe for judicial review because Peake had not yet obtained the necessary state permit and, thus, the ordinance had not actually prevented him from disposing of C & D debris on his property. The Second Circuit Court of Appeals rejected this challenge and found the case ripe for review. The court considered the issues fit for judicial review because they were "purely legal and may be decided without further factual development." 93 F.3d at 72. In addition, the court found that the plaintiffs would suffer substantial hardship if judicial review were withheld. It noted that Peake had already spent "considerable sums" of money in an effort to obtain the state permit and was "reluctant to spend more money" in pursuit of the state permit, since the local law would still prevent operation of his facility. *Id.* "Reviewing the ordinance at this time," the court noted, "will allow Peake to make an informed decision as to whether he should expend additional money to obtain a [state] permit to operate a C & D landfill." *Id.* The court reasoned that, if it upheld the ordinance, Peake would be able to cut his losses by halting his efforts to obtain a state permit; if it invalidated the ordinance, Peake could continue with the state permitting process, "knowing that obtaining the [state] permit would not be in vain." *Id.* In contrast,

if judicial review were withheld until Peake obtained a [state] permit, Peake would have to choose between (1) abandoning his plans to construct the C & D landfill in deference to a potentially unconstitutional ordinance and (2) expending "considerable sums" of money to obtain a [state] permit and thereafter commencing an action challenging the ordinance. We see no reason why Peake should have to expend substantial sums of money before challenging the

constitutionality of the ordinance. Nor should Peake be required to subject himself to the threat of the criminal penalties imposed by Law No. 1 in order to challenge the ordinance.

93 F.2d at 72. Citing *Triple G*, the court concluded that the claims were ripe for review. *Id.*

On September 23, 1997, this Court entertained argument on Beckman's motion to dismiss. Based on the circumstances of this case, the Court found the decision in *Triple G* to be persuasive authority and ruled that the Plaintiff's claims were ripe.[12]

Nevertheless, in his motion for summary judgment, Beckman renews his challenge to this Court's Article III jurisdiction over the instant matter. In essence, Beckman asks this Court to reconsider its ruling of September 23, 1997. In addition, Intervenors have recently filed a motion to dismiss, asserting that the instant controversy has become moot by virtue of a recent ruling from the Environmental Hearing Board relative to the DEP's September 25, 1996 suspension order. Because a federal district court is one of limited jurisdic-

tion—and thus has an independent responsibility at all times to satisfy itself of its subject matter jurisdiction—it is appropriate to revisit these jurisdictional challenges. *See Sedivy v. Richardson*, 485 F.2d 1115, 1123 (3d Cir.1973) (Adams, C.J., concurring), *cert. denied sub nom. Sedivy v. Schlesinger*, 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 774 (1975). In so doing, we must re-examine the exact nature of the claims being asserted.

**(2) *Reconsideration of Jurisdictional Challenges***

■ Plaintiff's first three causes of action assert purely facial challenges to the FAA Amendment on various constitutional grounds, namely, that the Amendment: creates an unconstitutional delegation of legislative and/or federal executive power to the Authority (Count I), violates the prohibition against Bills of Attainder (Count II), and violates Eagle's rights to equal protection of the laws and substantive (as opposed to procedural) due process under the Fifth and Fourteenth Amendments to the U.S. Constitution (Count III).[13]

**12.** Although the issue of standing was not expressly discussed by the Court, implicit in its ruling was a finding that Plaintiff had proper standing to bring the instant claims. *See Triple G*, 977 F.2d at 290–91 (finding that "live, focused case of real consequences" existed for the parties for purposes of establishing ripeness of claims and further finding that the plaintiff had standing to bring the claims for "essentially the same reasons").

**13.** While Eagle expressly alleges in Count IV a "takings" claim based on application of the FAA Amendment, *see infra*, it is not clear from the Complaint whether Eagle is also asserting a facial "takings" claim under Count III. Facial takings claims assert that the mere enactment of a statute effects a taking of property without just compensation, irrespective of its particular applications. *See Garneau v. City of Seattle*, 147 F.3d 802, 811 (9th Cir.1998) ("[I]n a facial claim, the court does not analyze the exaction at all. Rather, the court looks to whether the enactment of the ordinance, under which exactions will be imposed, effects a taking."); *Carson Harbor Village, Ltd. v. City of Carson*, 37 F.3d 468, 473–74 (9th Cir.1994) ("A facial challenge involves a claim that the mere enactment of a statute

constitutes a taking, while an as-applied challenge involves a claim that the particular impact of a government action on a specific piece of property requires the payment of just compensation."), *overruled in non-relevant part, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997).

A plaintiff can establish a facial "takings" violation by demonstrating either that (a) the regulation does not substantially advance legitimate state interests, or that (b) it denies the plaintiff the economically viable use of its land. *See Sinclair Oil Corp. v. County of Santa Barbara*, 96 F.3d 401, 405 (9th Cir. 1996) (citation omitted), *cert. denied*, 523 U.S. 1059, 118 S.Ct. 1386, 140 L.Ed.2d 646 (1998). In the context of "as applied" takings claims, the Supreme Court has stated that a challenge is unripe if the plaintiff has not sought compensation through the procedures the State has provided for doing so. *See Williamson County Reg. Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). However, it is less clear whether this same showing must be made as a prerequisite for a finding of ripeness in facial takings claims. *Cf. Williamson*

■ As to these claims, the Court remains convinced that they are ripe for disposition, based on the persuasive authority of *Triple G* and *Gary D. Peake Excavating*, discussed *supra*. In order to successfully raise a facial challenge in a non-First Amendment context, a plaintiff must demonstrate that the statute would be invalid in all of its potential applications. *See Artway*, 81 F.3d at 1252 n. 13 (3d Cir.1996) ("litigant 'must establish that no set of circumstances exists under which the Act would be valid.'") (citation omitted). Such an inquiry involves purely legal issues that are fit for judicial resolution. Further, the potential prejudice that Eagle, like the plaintiffs in *Triple G* and *Gary D. Peake,* will suffer in the absence of an adjudication also weighs in favor of a finding of ripeness.

Defendant Beckman asks this Court to reconsider its previous ruling and grant summary judgment in light of his "Counter–Statement of the Case," as set forth in his supporting memorandum. (*See* Mem. of Law in Supp. of Def. Beckman's Cross–Mot. for Summ. Judg. [Doc. No. 75] at 11 n. 16.) However, our review of Beckman's Counter–Statement shows that no new factual information has been set forth that would provide a basis for reconsideration of this Court's prior ruling. Essentially all of the material facts set forth in support of the instant motion were made known to the Court at the time of its September 23,

1997 ruling. In renewing his jurisdictional argument, Beckman does not set forth any new points of law but, rather, simply incorporates his previous motion to dismiss.

Moreover, on further consideration as to Count I through III, the Court remains convinced that *New Hanover* is distinguishable in material respects that make it inapplicable to the instant case. The ripeness of a claim must be determined by examining the posture of the plaintiff and the nature of the plaintiff's claims. In *New Hanover,* the plaintiffs were a township and other entities opposed to a prospective landfill. The harm which was being considered, therefore, was the harm that the construction and operation of the landfill posed to those opponents of the landfill. The court in *New Hanover* found that there was no immediate urgency in adjudicating the plaintiffs' challenge to the Army Corps of Engineers' permit issuance because unless and until the prospective landfill operator was able to obtain the required state permits, the landfill would never come into existence and the concerns of the plaintiffs would never come to pass.

By contrast, in *Triple G* and *Gary D. Peake,* the respective plaintiffs were prospective landfill owners/operators who were challenging government regulations that prohibited or significantly restricted their intended business activities. Unlike

County Reg. Planning Comm'n, 473 U.S. at 194 n. 13, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) ("[B]ecause the Fifth Amendment proscribes takings without just compensation, no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 suit.") and Yee v. City of Escondido, 503 U.S. 519, 533–34, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (indicating that the extent to which a property owner is compensated is irrelevant to a facial takings analysis where the plaintiff alleges that the government regulation does not substantially advance a legitimate state interest). One court has explained that the distinction lies in the type of facial "takings" challenge being asserted. See Sinclair Oil

Corp., 96 F.3d at 406 ("It appears ... that while the just compensation ripeness requirement does not apply to "legitimate state interest" facial taking claims, it does apply to claims premised upon the denial of a property's economically viable use.").

To the extent Count III encompasses a facial "takings" claim based on the theory that Eagle has been deprived of the economically viable use of its land, such a claim is not ripe and will not be considered by the Court. To the extent Plaintiff wishes to press a facial takings claim premised on the theory that the FAA Amendment does not substantially advance a legitimate state interest, it would appear that this type of claim is theoretically ripe. In so concluding we, of course, express no present opinion as to the substantive viability of such a claim.

the plaintiffs in *New Hanover*, the plaintiffs in *Triple G* and *Gary D. Peake* were faced with a Hobson's choice of either (a) foregoing their past investment and prospective efforts to develop the prospective landfills in deference to a potentially unlawful ordinance; or (b) investing significant time and money toward the permitting process in the face of an adverse regulation and uncertainty as to whether the regulation could ultimately be successfully challenged. It was the tension inherent in this dilemma that led the courts in *Triple G* and *Gary D. Peake* to conclude that there was a sufficiently "live" controversy for Article III purposes. In this case, Eagle faces a similarly difficult dilemma. The Court therefore adheres to its former ruling in which it followed the persuasive authority in *Triple G* and *Gary D. Peake*. Further, because we find *New Hanover* to be materially distinguishable authority, we do not feel bound by the holding in that case. Defendant Beckman's motion for summary judgment, to the extent premised upon his renewed jurisdictional challenges, is denied as to Counts I, II, and III.

For the same reasons, we remain convinced that Count V is ripe for disposition. In Count V Plaintiff asserts that the FAA by its terms does not apply to the Happy Landing Landfill. Simply put, the same types of concerns that give rise to a "case" or "controversy" for purposes of Plaintiff's facial attacks on the FAA Amendment's constitutionality also lead us to conclude that Plaintiff's claim under Count V is ripe as well. First, the issue of whether the FAA Amendment applies to Plaintiff's landfill is fit for judicial resolution because it involves a question of pure law.[14] Second, in the event the Amendment is upheld constitutionally, postponement of judicial resolution of Count V leaves Eagle in the same quandary as was previously discussed: *to wit,* Eagle would be faced with the potential dilemma of having to either (a) abandon its investment in deference to a potentially inapplicable (albeit constitutionally sound) law or (b) proceed with its efforts to complete the state permitting process, not knowing whether the Amendment would later be found applicable (and thus a permanent impediment) to the Happy Landing Landfill. Accordingly, because our previous ripeness analysis applies as well in the context of Count V, we find that Plaintiff's statutory construction claim is ripe for judicial review.[15]

Plaintiff's fourth cause of action is directed only against the Authority and its individual board members. It alleges that the FAA Amendment, as applied by those Defendants, caused a taking of Eagle's property without just compensation and deprived Eagle of its rights to equal protection of the laws, substantive due process, and procedural due process. We address these claims separately, *infra.*

### (3) *Intervenors' Motion to Dismiss*

The Court also has before it a motion to dismiss which was filed by the Intervenors on September 11, 1998. Intervenors challenge this Court's jurisdiction based on the doctrine of mootness. This motion is premised on a September 3, 1998 adjudication by the Pennsylvania Environmental Hearing Board which dismissed Eagle's appeal, at EHB Docket No. 96–215–MG, relative to the DEP's September 25, 1996

---

**14.** Eagle has not moved for summary judgment as to Count V, apparently because it believes that factual disputes make resolution of that issue unfit for summary disposition. However, on review of the record, it is evident that none of the supposed disputes are material to our resolution of this issue. As explained in more detail in Part III–B, infra, the record is essentially uncontroverted insofar as the state of development of the Happy Landing Landfill is concerned. Thus, the question before the Court is whether, in light of essentially uncontroverted facts, the FAA Amendment applies to Eagle's landfill. The issue is essentially one of statutory construction and, as it requires no further factual development, it is fit for judicial review.

**15.** Reaching Count V is also prudential in the sense that it provides the Court an opportunity to potentially resolve this case without having to address difficult constitutional issues.

order modifying and suspending Eagle's Water Obstruction and Encroachment Permit and suspending its other permits. Pursuant to Section 4 of the Pennsylvania Environmental Hearing Board Act, P.L. 530, No. 94 (July 13, 1988), *codified at* 35 P.S. § 7511 *et seq.* (West 1993), "No action of the [DEP] adversely affecting a person shall be final as to that person until the person has had the opportunity to appeal the action to the board." 35 P.S. § 7514(c) (West 1993). Intervenors argue that, in light of the fact that the DEP's suspension order has now become "final," Eagle lacks a cognizable interest in the outcome of this litigation.[16] Accordingly, Intervenors argue, the matters raised in Plaintiff's Complaint are now moot and the case should therefore be dismissed.

■ The concept of mootness, like ripeness, is one that emanates from Article III's "cases" and "controversies" requirement. *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698 (3d Cir.1996); *Armstrong World Indus.*, 961 F.2d at 411. A case becomes moot when the issues are no longer live or the parties lack a cognizable interest in the outcome of the litigation. *Blanciak*, 77 F.3d at 698. The "central question in mootness inquiries is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Artway*, 81 F.3d at 1246 (citations omitted).

■ Intervenors argue that, because the DEP's suspension of Eagle's permits is now "final," Eagle no longer has any permit necessary to operate a landfill, and thus does not have standing to challenge the FAA Amendment since it cannot be aggrieved by any application of that Act. Although this argument has some facial appeal, on closer review we find that it lacks merit. We agree with Plaintiff's assertion that, under the circumstances presented here, the "finality" of the DEP's action per 35 P.S. § 7514(c) is significant only in the context of determining when the DEP's action is properly appealable for judicial review.[17] Nothing in the EHB's decision has changed Eagle's position relative to the Happy Landing Landfill as a practical matter. As was true prior to the EHB's decision, if Eagle intends to pursue its plans for the Happy Landing Landfill, its only recourse barring a victory on further appeal before the Commonwealth Court is to begin the process of redesigning its landfill so as to comply with the requirements necessary for issuance of new DEP-issued permits. It bears reiterating that, prior to the EHB's decision of September 3, 1998, Eagle had affirmatively attested to its commitment to proceed with the Happy Landing Landfill regardless of the EHB's decision in No. 96–215–MG, even to the point of redesigning Happy Landing Landfill, if necessary. We previously found this representation sufficient to find an "actual case or controversy," consistent

16. It should be noted that Eagle has taken an appeal from the EHB's decision to the Commonwealth Court. As far as this Court is aware, that appeal is still pending.

17. Under Pennsylvania law, the "right of judicial review of an administrative decision occurs ... only when there has been an adjudication as defined under the Administrative Agency Law [2 Pa.C.S.A. §§ 101 *et seq.* (West 1995)]." *Callahan v. Pennsylvania State Police*, 494 Pa. 461, 431 A.2d 946, 948 (1981). The Administrative Agency Law defines an "adjudication" as: "any final order, decree, decision, determination, or ruling by an agency affecting personal or property rights, privileges, immunities or obligations of any or all

of the parties to the proceeding in which the adjudication is made." 2 Pa.C.S.A. § 101. Under the Act, agency "adjudications" must be in writing, must contain findings and the reasons for the adjudication, and must be served on all parties or their counsel. *See* 2 Pa.C.S.A. § 504. No adverse action by the DEP is a final action unless the affected entity or individual has had an opportunity to appeal the adverse action to the EHB.35 P.S. § 7514(c). If an appeal is taken to the EHB, the appellant receives a due process hearing and an adjudication from the EHB. A party may appeal the EHB's adjudication to the Commonwealth Court, but may not take such an appeal directly from a DEP action.

with the holdings of *Triple G* and *Gary D. Peake,* discussed *supra.* At no time has Eagle foresworn this intent.

Eagle's claims, therefore, remain sufficiently "ripe" for adjudication by this Court. In effect, Eagle is still faced with the Hobson's choice which initially led this Court to conclude that it had a sufficient "case" or "controversy" for Article III purposes. Eagle still must decide whether to abandon the landfill in deference to a potentially unconstitutional statute or, alternatively, to invest significant funds in an effort to obtain fully valid permits. This latter option creates the risk that Eagle may invest significant time and money only to find itself ultimately up against a "brick wall" by virtue of the FAA Amendment.

■ Intervenors have alleged that, in fact, Eagle faces no risk under the latter option because Defendant Beckman has represented that he has no present intention to enforce the FAA Amendment in the foreseeable future.[18] We find this argument unconvincing for two reasons. First, the DEP is not the only entity capable of enforcing the FAA Amendment, since the FAA itself has civil enforcement powers. Secondly, it is clear that Beckman has not foresworn his intention to apply the FAA Amendment for all time. His statement in essence is no more than a self-evident acknowledgment that there is no current reason to apply the Amendment, since Eagle currently is not permitted under state law to establish its Landfill.[19] The contingency remains, however, that Eagle may

in fact succeed in eventually obtaining new state permits.

The Court is cognizant of the fact that Eagle may, in fact, be unsuccessful in overcoming the legal barriers to its currently suspended permits. However, that contingency does not defeat ripeness. *See Triple G,* 977 F.2d at 290–91 ("There is always the chance that the [state Department of Environmental Management] will turn down Triple G's permit application, but that contingency, in and of itself, is not sufficient to defeat ripeness, ... particularly in light of the substantial practical effect the ordinance currently has on Triple G's long-term plans.")( internal citations omitted). As in *Triple G,* we think that the dispute here is sufficiently focused and that Eagle, like the *Triple G* plaintiff, should not be placed in the position of having to "jump through a series of hoops, the last of which it is certain to find obstructed by a brick wall." 977 F.2d at 291.

Thus, on reexamination of the jurisdictional issue this Court remains convinced that the claims presented in Counts I, II, III and V are sufficiently ripe for adjudication. Specifically applying the Third Circuit's refined standard for determining the ripeness of declaratory actions we find, with respect to those claims, that there is sufficient adversity of interest here, that a judgment would be sufficiently conclusive, and that a judgment would have significant utility. *See Pic–A–State Pa., Inc. v. Reno,* 76 F.3d 1294, 1298–1300 (3d Cir.1996), *cert. denied,* 517 U.S. 1246, 116 S.Ct. 2504, 135

---

**18.** This argument is premised upon a September 8, 1998 letter from the DEP's counsel, Thaddeus A. Webber, Esq., to this Court which states, in relevant part:

I am writing today to inform you that the Environmental Hearing Board has issued an Adjudication dated September 2, 1998[sic], wherein the Board dismissed the Plaintiff's appeal of the Suspension Order. Accordingly, barring reconsideration, the Plaintiff's permits necessary to construct the proposed landfill will continue to be suspended for the foreseeable future for reasons unrelated to the FAA Amendment.

Accordingly, Defendant Beckman continues to have no reason and no intention to apply the FAA Amendment, whether or not constitutional, to the Plaintiff's proposed landfill for the foreseeable future.

(Sept. 8, 1998 letter of Thaddeus A. Webber, Esq. to Judge McLaughlin.)

**19.** In a conference call held on February 12, 1999, counsel for Beckman confirmed that this letter was not a representation that the FAA Amendment would never, under any circumstances, be enforced by the DEP.

L.Ed.2d 194 (1996). Intervenors' motion to dismiss will therefore be denied as to Counts I, II, III and V.

### (4) Abstention

Defendant Beckman has urged this Court to abstain from entering any order which in any respects enjoins the DEP from a certain course of action relative to Eagle's state permits. Beckman urges that such an order is contrary to the *Burford* and *Pullman* abstention doctrines. *See Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Railroad Comm'n v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In determining whether these principles apply here, we bear in mind that "[f]ederal courts have an obligation to exercise their jurisdiction" and that "[a]bstention, therefore, is the exception rather than the rule." *Riley v. Simmons,* 45 F.3d 764, 771 (3d Cir.1995) (citations omitted). In addition, abstention "often imposes a substantial cost in delay, expense and legal uncertainty." *Professional Plan Examiners of New Jersey, Inc. v. Lefante,* 750 F.2d 282, 290 (3d Cir.1984).

Beckman argues that, because the DEP is vested with the discretionary authority to make determinations as to solid waste permits under the Pennsylvania Solid Waste Management Act, 35 P.S. § 6018.503(a)—including whether to "deny, suspend, modify or revoke any permit" based on an applicant's failure to comply with federal environmental laws, *see id.*— the issue of whether a Pennsylvania solid waste permit is issued, modified, etc. is exclusively a discretionary function under state law. Thus, Beckman reasons, an order from this Court which in any way enjoins the DEP from taking action on Eagle's permits would be "a direct affront to the Commonwealth's sovereignty in regulating solid waste facilities within its borders." (Mem. of Law in Supp. of Def. Beckman's Cross–Mot. for Summ. Judg. [Doc. No. 75] at 16.) The more prudent course, Beckman urges, is to "allow the Department to carry out its duties under [the Solid Waste Management Act] at the appropriate time." (*Id.* at 17.)

■ Beckman's concerns do not state any basis for application of *Burford* abstention insofar as Eagle's constitutional and statutory construction claims are concerned. That doctrine has been summarized as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (quoting *Colorado River Water Conserv. Dist. v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). In this case, it is not clear how any adjudication by this Court would "interfere with the proceedings or orders of state administrative agencies." We are being asked here to decide only issues of purely federal law which are separate and distinct from the issues being litigated by the parties in the state administrative proceedings. In fact, this Court's adjudication as to Counts I, II, III and V should assist—rather than interfere with—the DEP's efforts in carrying out its responsibilities under the Solid Waste Management Act. If, for example, we were to determine that the FAA Amendment is either inapplicable to Eagle's situation or is unconstitutional on its face, no real interference would have occurred with the DEP's administrative actions because, in that event, the DEP can have no future interest in applying an inapplicable or invalid statute against Eagle.

Indeed, Beckman has acknowledged that he would not attempt to apply the Amendment, should this Court find it constitutionally infirm. If, on the other hand, this Court determines that the Amendment is both applicable to Eagle's situation and constitutional, no interference will have occurred at all in terms of the DEP's administrative course of conduct. In short, to the extent that Beckman has discretion under the Pennsylvania Solid Waste Management Act to apply federal environmental laws, our resolution of the instant case does not create any ramifications other than to clarify the extent to which Beckman may purport to apply one aspect of federal statutory law. Thus there is no danger here that our adjudication will interfere with the proceedings or orders of state administrative agencies.[20] In addition, we are not faced with "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." Finally, this is not a case where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." State administrative policy is implicated by our adjudication only insofar as it depends on application of an allegedly inapplicable and/or unconstitutional federal statute. This is a topic on which this Court surely is well-suited to pass.

■ We also do not believe that the facts here warrant abstention under the *Pullman* doctrine. *Pullman* abstention may be employed "when a federal court is presented with both a federal constitutional issue and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question, ... [thus] avoid[ing] 'needless friction with state policies.'" *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Whitman,* 99 F.3d 101, 106 (3d Cir.1996)

(quoting *Chez Sez III Corp. v. Township of Union,* 945 F.2d 628, 631 (3d Cir.1991)), *cert. denied,* 520 U.S. 1155, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997). The doctrine thus requires the presence of three circumstances: (1) uncertain issues of state law underlying the federal constitutional claim; (2) state law issues subject to state court interpretation that could obviate the need to adjudicate or substantially narrow the scope of the federal constitutional claim; and (3) the possibility that an erroneous construction of state law by the federal court would disrupt important state policies. *Id.* If these special circumstances are all present, the court should make a "discretionary determination" as to whether abstention is appropriate under the circumstances, based on certain "equitable considerations." *Id.*

The factors necessary for *Pullman* abstention are not all present here. First, we are not faced with "uncertain issues of state law" underlying Plaintiff's federal claims. While Plaintiff happens to be engaged in ancillary litigation based on unrelated state issues, our adjudication does not require resolution of any of those issues. Consequently, we also are unhampered by concerns that "an erroneous construction of state law" by this Court would "disrupt important state policies." The Court therefore need not abstain from adjudicating Counts I, II, III or V.

### B. Statutory Construction Challenge: Count V

As we noted above, Eagle in Count V of the Complaint seeks a declaration that the FAA Amendment does not apply to it or the Happy Landing Landfill as a matter of statutory construction. Plaintiff has not moved for summary judgment on this Count, apparently because it believes there are material issues of fact concerning this claim that must be resolved by a fact

---

**20.** In striking down the FAA Amendment on constitutional grounds, we would not, for example, direct Beckman to issue to Eagle state permits that might otherwise be validly suspended on independent state law grounds.

finder. Defendants FAA and Intervenors, however, have proposed that summary judgment should be entered in their favor as to Count V. (*See* Def. FAA's Mem. in Supp. of its Cross–Mot. for Summ. Judg. and in Opp. to Pl.'s Mot. for Partial Summ. Judg. [Doc. No. 77] at 20–21 n. 7; Intervenors' Cross–Mot. for Summ. Judg. [Doc. No. 71] at 3.) Because the issue has been adequately joined by the parties, involves purely legal questions of statutory construction, and might potentially allow this Court to avoid determining constitutional challenges to the FAA Amendment, we will consider the argument on its merits.

The applicable statutory provision reads as follows:

> ... For the purpose of enhancing aviation safety, in a case in which 2 landfills have been proposed to be constructed or established within 6 miles of a commercial service airport with fewer than 50,-000 enplanements per year, no person shall construct or establish either landfill if an official of the Federal Aviation Administration has stated in writing within the 3–year period ending on the date of enactment of this subsection that 1 of the landfills would be incompatible with aircraft operations at the airport, unless the landfill is already active on such date of enactment or the airport operator agrees to the construction or establishment of the landfill.

49 U.S.C. § 44718(d) (West Supp.1998). The two key phrases under consideration are (a) the Amendment's limited application to cases "in which 2 landfills have been proposed to be constructed or established," and (b) the exemption of landfills that are "already active" as of the date of the Amendment's enactment.

Defendants contend that there is no genuine issue of material fact because it is clear that Happy Landing Landfill was "proposed to be constructed or established" within the meaning of the Act, and because it is undisputed that the Landfill was not "already active" at the time the Amendment was enacted into law. Plain-tiffs assert that, although the issue is ripe for resolution, it is not amenable to summary disposition because of disputed issues of material fact.

We conclude that the record is sufficiently clear that Plaintiff's fifth claim can be resolved as a matter of law at this stage. It is undisputed, for example, that, at the time of the FAA Amendment's enactment, the state of the Landfill was such that at least some initial measures toward development had been undertaken. For example, there appears to be no dispute that Eagle had obtained engineering studies and had installed eleven ground water monitoring wells. It is equally clear that a number of steps had not been undertaken that presumably would have been essential to the completion of the Landfill, *to wit*, installing primary and secondary liners, installing leachate collection and management systems, constructing borrow pits, installing sedimentation ponds, installing scales, and submitting a certification by a registered professional engineer for major construction. The parties also do not dispute that, at the time the Amendment was enacted, Eagle's DEP-issued permits had been suspended and, in one particular aspect, its Water Encroachment Permit revoked. It is undisputed that, by the terms of the February 7, 1997 CO & A (which the parties entered into several months after the enactment of the FAA Amendment), Eagle had agreed that it "shall not construct or operate the Happy Landing Landfill until and unless the Permit is reinstated and the bonding requirements of the [Solid Waste Management Act] are met." (*See* Ex.s in Supp. of Pl.'s Mot. for Summ. Judg. [Doc. No. 60], Ex. 3 at p. 3, ¶ 4.) In sum, it is clear that construction of the Landfill has never been completed and the Landfill was never operational in the sense of being able to accept waste. Plaintiff does not contend otherwise.

Nevertheless, Plaintiff argues that there are at least issues of fact as to whether the statute by its terms applies to the Happy Landing Landfill. Plaintiff's argument,

which we explore in more detail herein, is more a legal argument concerning the proper statutory construction of the Amendment than an argument as to contested factual issues. Thus, due to the essentially uncontroverted state of facts,[21] we conclude that Plaintiff's fifth count can be resolved as a matter of law by applying principles of statutory construction.

Turning to the merits, then, we first consider Eagle's argument that the Landfill is outside the scope of the Amendment because, at the time of the law's enactment, it could no longer be considered a landfill that was merely "proposed to be constructed or established." If Eagle is correct on this point, then it is entitled to judgment on Count V, since the Amendment only applies to situations involving "2 landfills [that] have been proposed to be constructed or established" under the specified circumstances. Plaintiff notes that one common dictionary definition of "propose" is to "put forth for consideration or acceptance." *See* WEBSTER'S NEW 20TH CENTURY DICTIONARY 1444 (2d ed.1979). Other common definitions include "to form or put forward a plan or intention," "to engage in talk or discussion," "to set before the mind (as for discussion, imitation, or action)," "to set before someone . . . as an aim or intent," or "to set forth for acceptance or rejection." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 944 (9th ed.1990).

Plaintiff claims that, by the time the FAA Amendment was enacted, the Happy Landing Landfill was beyond the stage of being merely "proposed" under any reasonable interpretation of that term. Eagle suggests that the acquisition of a state permit is a milestone in the landfill development process which alters the rights of the parties and moves the landfill beyond the stage of mere proposal. Thus, according to Eagle, the Happy Landing Landfill was beyond the stage of "proposal" when the FAA Amendment was enacted because, at that point, Eagle had already initially received its DEP-issued permits, even though they had been suspended prior to the Amendment's enactment. Eagle claims that the fact that its Landfill was beyond "proposal" is underscored when considering the next statutory phrase, "to be constructed or established." This phrase, it is argued, contemplates a future event and would be more accurately understood to mean "to be constructed or established [in the future]." According to Eagle, "[i]f construction activity or other circumstances causing the landfill to be established have already occurred, then what has been proposed is no longer a future event (as contemplated by the FAA Amendment) but rather a present event" not covered by the Amendment. (Pl.'s Reply Br. in Supp. of Mot. for Summ. Judg. [Doc. No. 81] at 36.)

We are not persuaded by this interpretation. For one thing, such an interpretation would render superfluous the qualifying phrase which excludes from the regulation those landfills that were "already active" on the date of the Amendment's enactment. If, as Eagle suggests, a landfill moves beyond mere proposal once the owner takes some steps toward "construction" or "establishment" of the landfill, then there is no need for the exclusion of "already active" landfills. Otherwise stated, if at least some construction activity or other activity toward the landfill's establishment has occurred, then the landfill is automatically outside the purview of the Amendment under Plaintiff's interpretation, and the exclusion applicable to "already active" landfills becomes superfluous.

---

21. The only purported factual issue concerns Intervenors' assertion that initial roads constructed at the Landfill site were not part of the Landfill construction because they were intended for an alternate purpose. Having considered Intervenors' evidence on this point, we are not convinced that the dispute is genuine. In any event, however, even if the dispute is genuine, we do not view it as materially impacting on the construction of the FAA Amendment.

Plaintiff attempts to account for the "already active" exclusion by interpreting this phrase as coterminous with the acquisition of permits and the commencement of physical site improvements. However, this does not remedy the foregoing anomaly. Under Plaintiff's interpretation, the "already active" exclusion becomes unnecessary if a landfill is no longer "proposed" (and thus, entirely outside the reach of the Amendment) once permits have been acquired and physical site improvements have begun. Furthermore, Plaintiff's interpretation of the term "already active" does not comport with the ordinary meaning of "active." The term "active" is commonly understood as meaning "characterized by action rather than by contemplation or speculation," "having practical operation or results," or, most relevant, "marked by present operation, transaction, movement, or use." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 54 (9th ed.1990).

■■■ The more logical interpretation, in our view, is that the Amendment is intended to apply in the first instance to all landfills, meeting the specified criteria, that "have been proposed to be constructed or established" at any time on or before the date of the Amendment's passage into law. An exception is then made for those landfills that were already active, in the sense of being *operational*, on the date of the Amendment's enactment. This interpretation is supported by the statute's use of the term "unless": i.e., the statute's prohibition applies to all landfills (meeting the other statutory criteria) that have been proposed to be constructed or established *unless* the landfill was already active on the date of the Amendment's enactment. The qualifier "unless" implies that "active"

landfills are a co-existing subset of "proposed" landfills. Under well-established principles of statutory construction, we are admonished to give meaning, if possible, to every part of the statute under consideration. *See In re Cohn,* 54 F.3d 1108, 1115 (3d Cir.1995) (citing *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 115 S.Ct. 1061, 1069, 131 L.Ed.2d 1 (1995)). Under Plaintiff's suggested interpretation, the term "unless"—and indeed, the whole exclusionary phrase applicable to "already active" landfills—is rendered superfluous because "active" landfills are mutually exclusive of "proposed" landfills. Thus, a landfill may not partake of both qualities. Under the Court's interpretation, both phrases have meaning and purpose. An "active" landfill is but a subset of landfills that have previously been proposed to be constructed or established. Moreover, already "active" landfills—meaning those that were operational on the date of the Amendment's enactment—are excluded from the otherwise applicable regulation.

Applying this construction we conclude, as a matter of law, that the FAA Amendment applies to the Happy Landing Landfill. Based on the record before us, there can be no material dispute but that Happy Landing Landfill had been "proposed to be constructed or established," but was not "already active" on the date of the FAA Amendment's enactment into law.[22] Accordingly, summary judgment will be entered in favor of all Defendants as to Count V of Plaintiff's Complaint.

### C. Facial Constitutional Challenges: Counts I, II and III

We turn next to the facial constitutional challenges raised in relation to the FAA

---

**22.** Plaintiff contends that, in the very least, this Court should apply the Rule of Lenity and construe the FAA Amendment narrowly in favor of Eagle. Under the Rule of Lenity, if the intended scope of a penal statute is ambiguous, even after resort to the statute's language and structure, legislative history, and motivating policies, then the statute is to be narrowly construed in favor of the defendant.

*See United States v. Sanders,* 165 F.3d 248, 251 (3d Cir.1999). Even assuming that the FAA Amendment is a "penal" statute for purposes of the Rule of Lenity, we would not apply the Rule here because we do not consider the FAA Amendment to be reasonably susceptible of Plaintiff's suggested interpretation.

Amendment. We first consider Plaintiff's equal protection claim and find, ultimately, that it is dispositive.

In Count III of the Complaint, Plaintiff challenges the FAA Amendment on the ground that it facially violates Eagle's rights to equal protection and substantive due process under the Fifth Amendment to the U.S. Constitution. The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It has long been recognized that the concept of equal protection, though expressly applicable to the States, applies equally to the federal government pursuant to the Fifth Amendment Due Process Clause. *See Federal Communications Comm'n v. Beach*, 508 U.S. 307, 312, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Schweiker v. Wilson*, 450 U.S. 221, 226 n. 6, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981).

The Equal Protection Clause is not a command that all persons be treated the same but, rather, "a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Where a law creates or results in a classification of certain individuals or entities, the level of scrutiny applied by courts depends on the nature of the classification involved. Those classifications that involve a suspect or "quasi-suspect" class or that impact a fundamental constitutional right require a heightened level of scrutiny. *See Artway*, 81 F.3d at 1267. However, classifications that do not involve suspect classes or which do not affect fundamental rights are given more deferential review and are generally considered appropriate if they are "rationally related to a legitimate government interest." *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir.1998); *Artway*, 81 F.3d at 1267 (citing *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249).

The parties here agree that deferential review is appropriate and that the proper inquiry is whether the FAA Amendment is rationally related to a legitimate government purpose. *See Artway*, 81 F.3d at 1267. In applying this standard, we bear in mind that legislation generally carries with it "a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Planned Parenthood v. Casey*, 947 F.2d 682, 726 (3d Cir.1991) (Alito, J. concurring in part and dissenting in part) (quoting *Hodel v. Indiana*, 452 U.S. 314, 331–32, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981)), *aff'd in part and rev'd in non-relevant part*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Accordingly, a person challenging a statute under the "rational review" standard "must convince the Court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.* (quoting *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)).

We begin by considering the stated purpose behind the FAA Amendment—that is, the "enhancement of aviation safety." Plaintiff does not dispute that the enhancement of aviation safety is a legitimate interest of the federal government. What it does dispute, however, is the means by which Congress has purportedly attempted to further that goal. Simply put, Plaintiff contends that the FAA Amendment, because of its peculiarities, does not rationally advance the goal of enhanced air travel safety.

▉ Notwithstanding the significant deference with which we view the statute, we are constrained to agree with Plaintiff's position. Taking the statute at face value, it only has application where: (a) two landfills have been proposed to be constructed or established (b) within six miles of a commercial service airport (c) that has fewer than 50,000 enplanements per year and (d) one of the landfills has been cited by the FAA as incompatible with aircraft operations (e) within the three years prior to the enactment of the

statute and (f) the subject landfill is not already active as of the enactment of the statute and (g) the airport operator has not consented to the construction or establishment of the subject landfill. 49 U.S.C. § 44718(d). These extremely specific criteria create a classification of affected landfills that is so grossly underinclusive as to be irrational. Indeed, notwithstanding the presumably national interest in air traffic safety, the statute for all intents and purposes applies only to two landfills in all of the United States: namely, the Leatherwood Landfill and the Happy Landing Landfill, both of which are located within six miles of the Dubois–Jefferson County Airport.[23]

Thus, the classification drawn by the Act is a class of two specific landfills, as opposed to all other existing or prospective landfills in the country. It order to fully appreciate the underinclusivity of the regulation, is significant to point out what is not covered by the FAA Amendment. First, the Act only applies where two landfills have been proposed to be constructed or established. By its terms, the statute does not apply where only one landfill has been proposed, regardless how potentially hazardous the location of that proposed landfill—nor does it apparently apply when three or more landfills have been proposed. One would logically believe that if two proposed landfills are bad for aviation safety, three or more proposed landfills are worse; yet the statute would apparently be inapplicable if three landfills were proposed to be established within six miles of an airport. Second, the Act only applies to landfills near small commercial airports of less than 50,000 enplanements per year. Here again, one might logically conclude that if landfills can create a danger of bird strikes at a small airport, they would pose a much greater threat near larger commercial airports where considerably more flights occur. Third, and perhaps most significant, the statute is temporally limited in its application by virtue of the retrospective requirement that, within the three years ending on the date of the Amendment's enactment (i.e. from October 10, 1993 through October 9, 1996), the FAA must have issued a statement finding that one of the two affected landfills is incompatible with aircraft operation. The Act thus does not apply to situations where both landfills are proposed to be constructed or established within the prohibited zone on or after the date of the statute's enactment. Finally, the Act only applies if the prospective landfill developer has not already received the consent of the airport operator, in this case, the Authority.

Having identified the discrete classified group of landfills affected by the Act, we must determine whether classification

**23.** Intervenors initially disputed the Plaintiff's assertion that the Amendment could only apply to the Dubois–Jefferson County Airport and the Leatherwood and Happy Landing landfills. In actuality, we do not perceive a genuine dispute as to this fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party). In answers to Plaintiff's requests for admissions, the FAA acknowledged that, as far as it was aware, the Act would only apply to one airport, the Dubois–Jefferson County Airport. Intervenors contend that this admission is somehow irrelevant or its evidentiary value minimal because the FAA did not purport to base its response on any formal study of the Act's applicability. We are unpersuaded. Ultimately, the Court must resolve summary judgment motions on the basis of the record before it. And under Fed.R.Civ.P. 36, the FAA's admissions carry no less evidentiary weight merely because they were made without the benefit of a formal study. Intervenors' only evidence in contravention of the admission is a newspaper article suggesting that the Act might apply to a Colorado airport. However, because this evidence is hearsay and is not apparently reducible to admissible evidence at time of trial, it cannot be considered by the Court on a Rule 56 motion. And, in any event, the FAA has admitted that it investigated the potential applicability of the Amendment to that airport (the Greater Rockford Airport in Illinois) and concluded that the Amendment would not apply. (*See* Appendices in Supp. of Pl.'s Mot. for Summ. Judg. [Doc. No. 61], Ex. C at ¶ 23.)

along these very narrow lines can be said in any manner to rationally serve the stated goal of enhanced aviation safety. We conclude that, while certain aspects of the classification can be justified as rational, other aspects cannot. For example, the Court does not take issue with the general concept of creating a six-mile buffer zone around airports, from which all proposed landfills are excluded. While Plaintiff suggests that a "six-mile" zone is arbitrary and unrelated to past FAA regulatory guidelines, we do not believe that a general six-mile prohibition, in and of itself, would violate equal protection principles. Under such a general guideline, we can well envision that Congress might rationally have believed that prohibiting the establishment of any landfills within six-miles of an airport would advance the cause of air safety. Although such a prohibition might arguably be overly-conservative, it would not offend equal protection principles. In addition, we can conceive of a rational purpose (albeit one unrelated to air safety) for regulating only proposed landfills and excluding already active ones from the statute's scope. Congress, for example, might have intended to limit the effect of the Act by protecting those who already had an expectant property interest in their already active landfill operations. The statute is rationally related to achieve that end.

The problem, however, is that the other essential and defining features of the class are not rationally related to the goal of advancing national air safety. For example, there is nothing apparently logical in applying the statute only to landfills near small commercial airports with less than 50,000 enplanements when presumably airports with a greater concentration of air traffic are more threatened by the potentiality of nearby landfills. And even if we presume rationality in this distinction, it is hard to conceive of any rational purpose for the statute's numerical and temporal limitations. For example, one is hard pressed to state a logical reason for applying the protection only when two landfills are proposed, as opposed to three, four or five landfills. In fact, even one landfill under certain circumstances (e.g., if positioned immediately beneath a runway extension) might prove more dangerous than two landfills (e.g. ones that are farther away, smaller in size, not positioned near runways, etc.).[24] In short, there is nothing about groups of "two proposed landfills"— as opposed to other numbers—that logically relates to aviation safety so as to justify imposing it as a distinguishing characteristic of the class.

Similarly, there is an element of arbitrariness in the statute's temporally limited application. As drafted, the Amendment applies only to a finite number of proposed landfills which are determined by retroactive events (i.e. an FAA determination within a closed three-year period that one of the two subject landfills is incompatible with airport operations) not necessarily within the control of the affected landfill owner.[25] If Congress truly meant to enhance aviation safety, there is no obviously logical reason to limit the Act's effectiveness so radically by excluding from coverage all prospective proposed landfills.

The Court recognizes that legislatures are not required to enact laws that classify individuals with "mathematical nicety";

24. The FAA's Final Report to Congress on "Potential Hazards to Aircraft by Locating Waste Disposal Sites in the Vicinity of Airports" (April 1996) discusses several factors that are relevant to assessing the danger posed by landfills, such as native bird populations, numbers of birds in the area, local geography, the presence of man-made waterbodies or other features, and airport traffic patterns relative to the location of a particular landfill. (See Def. FAA's Mem. in Supp. of its Cross-Mot. for Summ. Judg. and in Opp. to Pl.'s Mot. for Part. Summ. Judg. [Doc. No. 77], Ex. 1 at 13–15.)

25. As this case demonstrates, the plain terms of the Amendment may preclude a prospective landfill owner from establishing his or her landfill even though the landfill was never the subject of a prior FAA incompatibility statement.

thus, we are "compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller v. Doe,* 509 U.S. 312, 319–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Nevertheless, governments "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne,* 473 U.S. at 446, 105 S.Ct. 3249 (citing *Zobel v. Williams,* 457 U.S. 55, 61–63, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982); *United States Dep't of Agric. v. Moreno,* 413 U.S. 528, 535, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973)). Here, as in every equal protection case, the "appropriate comparison . . . is between those persons subject to the classification and those persons who are similarly situated but for the classification." *Maldonado v. Houstoun,* 157 F.3d at 187. Thus, we consider Leatherwood Landfill and the Happy Landing Landfill as against all other similarly situated landfills in the country. For present purposes we consider "similarly situated" landfills to include all other landfills nationwide that are proposed to be built or established within six miles of a commercial airport.[26]

Using this initial benchmark, the class of affected landfills is too attenuated to be considered rationally related to the legitimate governmental goal of enhanced aviation safety. Its terms are so narrowly drawn that it can have practical application only in the most select circumstances—indeed, only in the case of two particular landfills in the entire nation. It excludes from regulation landfills near larger commercial airports where air traffic is undeniably heavier. It apparently excludes from coverage landfills that are "proposed to be constructed or established" in numbers greater than two. Further, by requiring that the affected landfill be tied to a retrospective FAA incompatibility determination, the Amendment on its term has virtually no prospective effect. In fact, even where a proposed landfill meets the very specific criteria of the Amendment, the landfill may escape regulation if the local airport operator decides to waive the restrictions of the statute. The result is a classification comprised only of (at most) two landfills to the exclusion of all other landfills located within a six-mile radius of a commercial airport.[27]

While it is well settled that Congress may legislate without mathematical precision, courts nonetheless have recognized that a class may be so grossly underinclusive as to bear no rational nexus to the proffered governmental interest. *See, e.g.,*

---

26. We select these features because we can presume that establishing a blanket six-mile safety zone logically (if perhaps unartfully) advances the cause of air safety.

27. Ironically, while the statute is obviously under-inclusive in its classification, it is also over-inclusive in at least one respect. Specifically, the Amendment on its face ties the fate of one "covered" landfill to the FAA's determination that the second "covered" landfill was not compatible with airport operations. Thus, the statute facially permits of a situation where an otherwise objectively "safe" landfill is penalized because of the unsafe features of a completely unrelated landfill. Plaintiff argues that the circumstances here are a case in point. According to the FAA's admissions, the Happy Landing Landfill site is located more than five miles from the Airport and is not situated beneath the approach course to any runway at the Airport. Because Happy Landing's site is not situated beneath the approach course to a runway, aircraft on final approach to the airport would not be expected to pass over that site. Moreover, in the absence of the FAA Amendment, Happy Landing Landfill would not have been subject to an FAA compatibility study because it is located more than five miles from the Airport and is thus outside the criteria of FAA Order 5200.5A. The Leatherwood Landfill, by contrast, is located less than 13,000 feet from the Airport and is located beneath the centerline extended from one of the Airport's runways. The FAA found that, because approaching aircraft could be expected to pass over the Leatherwood Landfill's location at lower altitudes, the landfill presented a significantly increased risk of aircraft bird strikes. (*See* Pl.'s Statement of Material Facts in Supp. of Mot. for Summ. Judg. [Doc. No. 59] at ¶¶ 13, 25, 27–29.)

*Long Island Lighting Co. v. Cuomo*, 666 F.Supp. 370, 422–25 (N.D.N.Y.1987) (holding that New York's "Used and Useful Act" violated equal protection where it was drafted in such a manner as to have practical application only to one utility company, despite legislature's professed intention to assure that utility customers would not bear the costs of nuclear power plants that failed to commence or continue commercial operation; concluding that impartial legislator could not have logically concluded that the classification drawn would serve a legitimate public purpose), *vacated in non-relevant part*, 888 F.2d 230 (2d Cir.1989); *Burstyn v. City of Miami Beach*, 663 F.Supp. 528, 533–35 (S.D.Fla. 1987) (zoning ordinance which regulated adult congregate living facilities by, *inter alia*, limiting their height to no-more than four stories and excluding such facilities from designated streets in commercial areas violated equal protection where regulation created a class that was "grossly underinclusive" to its stated goals). Simply stated, the classification drawn by the FAA Amendment is too attenuated relative to the stated purpose of aviation safety to be considered rational.

Nevertheless, Defendant FAA and Intervenors insist that the Amendment survives rational-relation scrutiny. Apparently recognizing that the Act has application only to the two proposed landfills sites near the Dubois–Jefferson County Airport, the FAA and Intervenors nevertheless contend that it is Congress's prerogative to regulate in a piece-meal fashion, addressing initially those situations that present special concern. This assertion is certainly correct as a matter of legal principle. For example, in *City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), the Supreme Court upheld an ordinance that generally prohibited the sale of food from pushcarts in the City's historic French Quarter, but which contained a "grandfather clause" exempting two pushcart food vendors from the general regulation. It was acknowledged that the general prohibition had been passed with the legitimate intent of preserving "the appearance and custom valued by the Quarter's residents and attractive to tourists." 427 U.S. at 300, 96 S.Ct. 2513. Nevertheless, prospective vendors challenged the grandfather exemption as violative of equal protection principles. In rejecting this challenge, the Supreme Court noted the established principle that "a legislature need not 'strike at all evils at the same time,' … and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'" 427 U.S. at 305, 96 S.Ct. 2513 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (internal citations omitted)). The Court concluded that the grandfather clause was not constitutionally infirm because the city could rationally have chosen to initially eliminate vendors of a more recent vintage on the basis that newer businesses were less likely to have built up substantial reliance interests in continued operation within the French Quarter. Further, the exemption of two particular vendors, each of whom had been operating in the area for over 20 years, could be justified on the theory that the exempted vendors "had themselves become part of the distinctive character and charm that distinguishes the Vieux Carre." *Id.*

Intervenors suggest that, in this case, Congress may have drawn the Amendment narrowly out of particular concerns about the situation presented at the Dubois–Jefferson County Airport—namely, the presence of two proposed landfills within six miles of a small commercial airport, one of which had been determined to be incompatible with airport operation. Intervenors also point out that the Airport is situated near two small lakes, Kyle Lake and Treasure Lake, which it is alleged, serve as roosting and feeding areas for birds.[28]

---

**28.** Plaintiffs take issue with this assertion, arguing that there is no evidence in this record

Thus, we are urged to consider the possibility that, in light of the confluence of unique features present at the Airport—a situation not specifically covered under FAA Order 5200.5A and the FAA's Advisory Circular—Congress perceived a need to take specific action so as to prevent a hazard that would otherwise fall through a regulatory "gap."

This classification might make sense if there truly is (or if Congress could at least reasonably believe there is) something unique about the Dubois–Jefferson County Airport that justifies distinguishing it from other airports relative to the goal of enhanced aviation safety. However, nothing in this record suggests that the Airport's topographical features, combined with the presence of the two proposed landfills makes it unique among all other airports nationwide in terms of presenting a greater threat to air safety due to bird strike potential. Nor is such a presumed fact rational, based on common sense. It is instructive in this regard to consider the exact nature of the "gap" being filled here. Prior the FAA Amendment's enactment, the FAA's Order 5200.5A and its Advisory Circular established certain parameters for assessing the danger proposed by landfills near airports. Under these standards, landfills essentially were deemed to present a safety hazard if they were located within 1.9 miles of a runway end serviced by turbine-powered aircraft or within .95 miles of a runway end used only by piston powered aircraft, or within five miles of a runway end that attracts or sustains hazardous bird movements from feeding, water or roosting areas into, or across the runways and/or approach and departure patterns of aircraft. (FAA Order 5200.5A, Pl.'s Ex. 1, Tab C.) Landfills not meeting these criteria but which were located within a five mile radius of an airport would be subject to a compatibility study and might, or might not, be found compatible with airport operations depending on individualized characteristics of the landfill, such as its distance from the airport (especially from runway ends or proposed runway expansions), whether it is located in a traffic pattern for the type or category of aircraft serviced by the airport, whether the migratory bird patterns in the area impact on the safety of the landfill, etc. Because of its specific location, the Leatherwood Landfill was found incompatible by the FAA under the foregoing standards. The record indicates that, in fact, Leatherwood's state permits were suspended because of this finding by the FAA.[29] Thus, under the law as it existed prior to the FAA Amendment, Leatherwood Landfill was essentially prohibited from coming into operation because of the FAA's incompatibility criteria.

The FAA Amendment, in contrast, provides an absolute blanket prohibition of the

to support the allegation that Kyle Lake or Treasure Lake serve as roosting, breeding or feeding areas for birds. In response to this challenge, Intervenors appended to their reply brief an affidavit from Dr. Charles Schaadt, who purported to opine about the special dangers present at the Dubois–Jefferson County Airport. Dr. Schaadt attested that he believed "with a reasonable degree of scientific certainty that the location of the DuBois–Jefferson County Airport with respect to bodies of water including but not limited to Kyle Lake and Treasure Lake, and the proximity of the two proposed landfills create a unique situation with respect to making food available to species attracted to landfills, roosting areas, and the potential for attractive food/roosting habitat to exist in areas proximate to the landfill." (Affid. of Charles Schaadt, Ex. 10 to Intervenors' Resp. to Pl.'s Reply Br. in Supp. of Pl.'s Mot. for Summ. Judg. [Doc. No. 89] at ¶ 6.) Eagle subsequently filed a motion seeking to strike this affidavit on the grounds, *inter alia,* that it failed to properly qualify Dr. Schaadt as an expert qualified to opine on the stated subject matter, failed to qualify his opinion as a lay witness, and failed to establish a factual foundation for the opinions being asserted. (*See* Pl.'s Mot. to Strike the Affid. of Charles Schaadt [Doc. No. 94].) By order dated March 26, 1998, this Court granted Plaintiff's motion to strike the Schaadt Affidavit. (*See* Order of 3/26/98 at Doc. No. 94.)

29. It appears that Leatherwood, Inc. may be appealing this matter.

covered landfills within a six-mile radius of the subject airport. With respect to any landfills (e.g. Leatherwood) that had received a prior FAA incompatibility statement within the relevant three year window, this new coverage did not provide new protection. The only real "gap" being covered was the now universal prohibition of one additional landfill (not two, three, or more additional proposed landfills) that is either (a) located within a five-mile radius and, although subject to a compatibility study, was found by the FAA to be compatible with airport operation, or (b) located between five and six miles from the airport. If we are to accept the Intervenors' theory, we must essentially presume that Congress deemed this "gap" (which, in practical effect covers only one additional proposed landfill in the entire country) so consequential to the enhancement of aviation safety as to make it the specific target of national legislation to the exclusion of all other circumstances involving landfills near national airports. Such an interpretation strains credulity. Under the circumstances here, it is simply irrational to speculate that the tiny "gap" sown shut by the FAA Amendment was the phase of aviation safety "most acute to the legislative mind." *Katzenbach*, 384 U.S. at 657, 86 S.Ct. 1717. In short, the classification sought to be drawn by the Amendment in the name of "aviation safety" is "so attenuated as to render the distinction arbitrary [and] irrational."

*City of Cleburne*, 473 U.S. at 446, 105 S.Ct. 3249.

Moreover, even accepting for a moment this proposed governmental purpose, the Amendment still suffers from irrational deficiencies because it would appear to have no prospective application beyond the Leatherwood and Happy Landing Landfills.[30] If the situation present at the Airport is truly a unique threat to aviation safety, it is irrational for Congress to expressly limit the protection to a "hermetically sealed" number of landfills and thereby provide protection for only a finite period of time.[31] Further, if the situation at the Airport is so uniquely precarious as to justify a classification of two prohibited landfills, it is hard to understand why Congress would then include an "escape hatch" within the Amendment, whereby even an otherwise prohibited landfill can avoid regulation by obtaining the consent of the airport operator. In short, if Congress intended to fill a glaring regulatory "gap" we cannot see how the FAA Amendment rationally advances that goal.

The FAA posits that Congress may have deliberately regulated in a limited fashion so as to use the Dubois–Jefferson County Airport as a sort of "test case." It is argued, for example, that implementing a gradual approach could allow Congress to determine if a six-mile radius is significantly safer than the currently recommended five-mile radius set forth in the FAA's administrative guidelines. Alterna-

---

**30.** Intervenors suggested at oral argument that, because Eagle's permits are currently suspended, if another proposed landfill owner came in tomorrow and sought to establish a landfill within six miles of the Dubois–Jefferson County Airport, it would be considered the "second proposed landfill" within the meaning of the Act and could therefore be precluded. We question this interpretation as facially inconsistent with the express language of the Amendment. In any event, even if one additional prospective landfill within six miles of the Airport could be covered by the Amendment, one still might question how the next proposed landfill after that would be treated. And, it is also worth noting that, if Leatherwood Landfill ceases to exist as a

"proposed landfill," the statute can have no application at all because it is Leatherwood's FAA letter of incompatibility that triggers application of the Amendment to the other landfill within the six-mile radius.

**31.** Unlike the grandfather clause at issue in *Dukes, supra*, which was conceivably aimed at protecting seasoned push cart vendors who had greater expectancy interests in their livelihood, the legislation here acts to penalize only those limited landfills that have already been proposed (and are therefore potentially under construction) but are not yet operational. Inherent in this scheme is the foreseeability—in fact, likelihood—of lost investment.

tively, it is suggested, a gradual approach may be a more effective way for Congress to engage in a cost-benefit analysis that this type of legislation may have on the landfill industry.

Assuming such a legislative intent, however, it is hard to see how the statute rationally advances this stated goal. It is not clear, for example, how the imposition of a six-mile landfill restriction as to one particular airport would provide information that has significant application on a national level. Given the myriad of individual factors that may impact on the likelihood of bird strikes at any given airport (e.g., air traffic patterns, local geography, native bird populations, wildlife migratory patterns, topography, air traffic volume, etc.) it is difficult to see how implementation of the landfill restrictions at one single small commercial airport could reasonably be expected to result in any meaningful information at a national level. It is equally unlikely that a meaningful assessment could be made as to the impact of the regulation internally at the Dubois–Jefferson County Airport. There is no suggestion that the Dubois–Jefferson County Airport has a history (much less an accurately documented record) of prior bird strikes which may serve as a meaningful benchmark against which to judge the effectiveness of a future six-mile landfill ban. In fact, the result of applying the FAA Amendment to the Dubois–Jefferson County Airport is (at least for now) merely a continuation of the status-quo. Thus, the idea that Amendment may serve as a useful test-case is highly suspect. This is especially true in light of the fact that the Amendment does not theoretically apply to landfills that may be proposed to be established within six miles of the Dubois–Jefferson County Airport in the future. In short, it is difficult to conceive how Congress could have reasonably speculated that implementation of Amendment could provide a useful source of information where, by its express terms, the statute's application is so extraordinarily narrow as to be practically meaningless on a national level.

In sum, notwithstanding the very deferential approach with which we must view the FAA Amendment, we conclude that it does not survive rational-relations review. Because the Amendment violates principles of equal protection, it is constitutionally infirm and cannot be upheld. Accordingly, the Court will grant Plaintiff's motion for summary judgment as to Count III insofar as it relates to Plaintiff's equal protection claim. In light of our ruling, we need not reach the other constitutional attacks contained in Counts I, II and III.

### D. The Claims Against Defendant Beckman

We next consider some arguments unique to Defendant Beckman, against whom Plaintiff seeks injunctive relief in Counts I, II, and III of the Complaint and injunctive and declaratory relief in Count V. Specifically, Plaintiff requests this Court to "order Steven Beckman to reinstate Eagle's permits, to the extent these permits were suspended or revoked on the basis of the need for Eagle to demonstrate compliance with the FAA Amendment" or, alternatively, "enjoin Steven Beckman from suspending or revoking Eagle's permits on the basis of the need for Eagle to demonstrate compliance with the FAA Amendment." (Complaint at ¶¶ 62(d), 71(d), 75(c), 86(d).)

Beckman has essentially raised three grounds for summary judgment. Two of them—his jurisdictional challenges and his argument in favor of abstention—have already been discussed and disposed of. We now address his final argument, i.e., his assertion that he should be dismissed from this action on Eleventh Amendment Immunity grounds.

The Eleventh Amendment precludes federal courts from entertaining suits in law and equity brought by citizens against a State in the absence of the State's consent. U.S. CONST. amend. XI; *Hans v.*

*Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Accordingly, a State may be sued in federal court only where (i) the State has consented to suit or (ii) Eleventh Amendment immunity has been validly abrogated by Congress. *See Welch v. Texas Dep't of Highways and Public Transp.,* 483 U.S. 468, 473–74, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987); *Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d 690, 694 (3d Cir.1996). Plaintiff does not contend that either of these exceptions apply. Moreover, it is clear that States are not "persons" within the meaning of 42 U.S.C. § 1983 and thus, cannot be held liable under that statute for constitutional violations. *Blanciak,* 77 F.3d at 697 ("Since Congress expressed no intention of disturbing the states' sovereign immunity in enacting § 1983, these suits, when brought against a state, are barred by the Eleventh Amendment.")

Here, of course, Plaintiff has not named the DEP as a defendant but, instead, has sued Beckman in his official capacity. (*See* Complaint at ¶ 6.) Under the jurisprudential principles that have grown out of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), state officials may be subjected to suit under § 1983 where the relief is prospective only and is designed to end a constitutional violation. *Id.* at 166–68, 28 S.Ct. 441. This narrow exception is premised on the fiction that actions of a state official taken pursuant to an unconstitutional law could not be regarded as "official or representative," since the underlying authorization for these actions are void under the Constitution. *See id.* at 160, 28 S.Ct. 441; *Blanciak,* 77 F.3d at 697.

■ In light of our conclusion that the FAA Amendment violates the Equal Protection Clause, Plaintiff may appropriately obtain declaratory and injunctive relief against Beckman pursuant to Count III under the principles of *Ex Parte Young.*[32] In fact, Beckman does not seriously contest this proposition.[33] His main concern appears to be that the Court not enter injunctive relief in the form of an order that would affirmatively command the DEP to reinstate Eagle's permits. Because the suspension or reinstatement of those permits depends on issues of state law not properly before us, this Court would not be inclined to enter such an order. Instead, it is sufficient that we have ruled under Count III that the FAA Amendment is invalid as a violation of equal protection principles. We presume that Defendant Beckman and the DEP will conduct their business consistent with this ruling.[34]

Beckman's only other point on this issue is his suggestion that Count V (the statuto-

32. We recognize that, Beckman's authority relative to the issuance of solid waste permits technically comes from the Pennsylvania Solid Waste Management Act. *See* 35 P.S. § 6018.503(a). Nevertheless, to the extent that Beckman has the authority to premise his actions on an individual's alleged failure to comply with *federal* law, including the FAA Amendment, he is properly named as a Defendant in this action, since he obviously can not require an individual to comply with a constitutionally invalid federal statute. Consequently, to the extent that Beckman has enforcement powers relative to the FAA Amendment, he is a proper defendant under Counts I, II, and III.

33. At oral argument held on May 28, 1998, Beckman's attorney acknowledged that *Ex Parte Young* might "arguably" apply for purposes of the Court's resolution of the facial constitutional challenges to the FAA Amendment. Counsel therefore indicated that Beckman would not object to this Court's jurisdiction over him for purposes of Counts I, II and III. (*See* Tr. of May 28, 1998 hearing [Doc. 117] at 59.)

34. It is clear under well established Eleventh Amendment principles that, having sued Beckman only in his official capacity, Plaintiff cannot maintain an action against him for damages. *See Melo v. Hafer,* 912 F.2d 628, 635 (3d Cir.1990) (Eleventh Amendment bars a suit against state officials in their official capacity, because the state is the real party in interest inasmuch as the plaintiff seeks recovery from the state treasury) (citing *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)), *aff'd,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

ry construction claim) should be dismissed as moot. Essentially, Beckman contends that if, as we have found, the Amendment is unconstitutional, then Count V is moot because the DEP would not attempt to apply an unconstitutional statute. If, on the other hand, the Court would have found the Amendment constitutionally valid, then the Court should have deferred to the DEP and allowed the DEP to construe the Amendment in the first instance. However, we have not opted for this approach because we have found it more prudent to address Count V as a possible means of attempting to avoid the resolution of constitutional issues. And, although Beckman may be in a position to ensure that certain federal environmental laws are complied with, he is not necessarily in any better position than the Court, in terms of expertise, when it comes to construing the Amendment's language. As we previously observed in discussing Beckman's abstention argument, construction of the FAA Amendment does not directly involve questions of state law. Accordingly, except to the extent Plaintiff may be seeking compensatory or other damages from Beckman, his argument in favor of Eleventh Amendment immunity is denied.

### E. Plaintiff's As–Applied Claims Against the Airport Authority: Count IV

Plaintiff's fourth count asserts various "as-applied" constitutional claims against the Authority and its Board Members in their individual and official capacities. Specifically, Count IV asserts that the Defendants' denial of consent to develop the Happy Landing Landfill violated Eagle's Fourteenth Amendment rights to equal protection of the laws, substantive and procedural due process, and protection against the "taking" of Eagle's property without just compensation. We conclude that the Authority and its individual board · members are entitled to judgment on these claims.

██ As an initial matter the Court, on further reflection, has doubts as to the ripeness of Eagle's "as applied" due process and "taking" claims. Eagle essentially argues that, by virtue of the Authority's conduct, Eagle has been deprived of the only economically viable use of its land. However, it is undisputed that, at the time of the Authority's decision, and even now, Eagle was and remains independently prohibited from developing the Landfill by virtue of (a) the DEP's September 25, 1996 suspension order, and (b) the February 7, 1997 CO & A. Thus, the Authority's "application" of the FAA Amendment has not, at any time relevant to this action, caused the deprivation of any property interest. In fact, it is not even clear that a fact finder could presently determine whether Eagle actually has been denied *all economically viable use* of its land. It also seems that Plaintiff's as applied "taking" claim are independently unripe. because of the fact that Plaintiff has not yet formally been denied "just compensation." *See Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194–95, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *Sinclair Oil Corp. v. County of Santa Barbara*, 96 F.3d 401, 405 (1996), *cert. denied*, 523 U.S. 1059, 118 S.Ct. 1386, 140 L.Ed.2d 646 (1998). Accordingly, Plaintiff's "as applied" due process and takings claims will be dismissed for lack of ripeness.

██ Eagle's "as applied" equal protection claim against the Authority may not suffer ripeness problems since, unlike the other "as applied" claims, it does not depend on a future deprivation of a property interest. However, such a claim fails on the merits, since the facts here do not support a claim that the Authority applied the FAA Amendment in any unlawfully discriminating fashion. In fact, any claim of "as applied" discrimination is theoretically implausible because this case represents the only time the Authority has been called upon to act under the FAA Amendment. In determining to withhold consent

for the Landfill, the Authority was not called upon to distinguish Eagle from other interested (and allegedly "similarly situated") applicants. The exceedingly narrow application of the Amendment, it is clear, results from the language of the statute itself, rather than the manner in which the Authority applied it. Consequently, Eagle cannot maintain a claim for "as applied" denial of equal protection under Count IV.

Alternatively, to the extent the Count IV claims are ripe, the Court's disposition of Plaintiff's facial equal protection challenge under Count III has rendered Plaintiff's requested relief moot, since an adjudication of Count IV would have little practical utility at this point. Whether or not this Count determines that the Authority's conduct was unconstitutional, the Authority's denial of consent is just as void by virtue of this Court's ruling on the facial equal protection claim. Eagle's request for declaratory relief on Count IV therefore adds nothing. Eagle's requests in Count IV for a court order directing the Authority to approve Eagle's request for consent to construct the Landfill is likewise mooted by our disposition of Count III.

For all of these reasons, the Court concludes that Plaintiff has no presently viable claims under Count IV and, accordingly, the Authority is entitled to judgment on those claims.

## IV. CONCLUSION

Based upon the foregoing discussion, Plaintiff's motion for partial summary judgment will be granted in part insofar as it relates to Eagle's facial equal protection challenge under Count III. In all other respects, Plaintiff's motion will be denied as moot. The FAA's and Intervenors' cross-motions for summary judgment will be granted as to Count V and denied in all other respects. Defendant Beckman's motion and amended motion for summary judgment will be granted to the extent set forth above and denied in all other respects. The Authority's motion for summary judgment as to Count IV and V will be granted. The Intervenors' motion to dismiss is denied as moot with respect to Count IV and denied in all other respects.